FIRST TRUST & SAVINGS BANK et al. v. BITTER ROOT VALLEY IRR. CO. et al.

(District Court, D. Montana. July 3, 1918.)

No. 71.

1. EQUITY ⬤⟹279—AMENDED ANSWER—REJECTION—DENIAL OF FORMER ADMISSIONS.

In a suit in equity an amended answer, tentatively received during trial, "more in detail," would be rejected to the extent found to deny former admissions.

2. EQUITY ⬤⟹283—AMENDED ANSWER—REJECTION—SURPRISE.

In a suit in equity an amended answer, tentatively received during trial, "more in detail," would be rejected to the extent found to raise new issues operating as a surprise.

3. MORTGAGES ⬤⟹48(1)—GENERAL DESCRIPTION—VALIDITY.

Though a large part of the property description in a mortgage or trust deed of an irrigation company's real and personal property was general only, it was valid.

4. MORTGAGES ⬤⟹310—TRUSTEE—RIGHTS UNDER BANKRUPT'S TRUST DEED.

Where an irrigation company's trust deed to secure bonds, provided that lands and water rights sold by it should be released on its deposit of first lien purchase-money notes and mortgages amounting to $42 per acre, its trustee in bankruptcy, after its default in payment of a bond installment, as to contracts for land sold, but not released, was not entitled to the sale price in excess of $42 per acre, or on payment of that amount to compel releases.

5. BANKRUPTCY ⬤⟹254—RIGHTS OF TRUSTEE.

The trustee of a bankrupt estate succeeds to the bankrupt's rights in the premises, subject to its liabilities, and takes its contracts, and can compel their performance, if he performs them on its part.

6. MORTGAGES ⬤⟹397—FORECLOSURE—DEFAULT IN INSTALLMENTS.

Where an irrigation company's trust deed to secure its bonds was an entire contract, to be performed in installments, all bonds would become due upon a default in an installment.

7. MORTGAGES ⬤⟹533—TRUST DEED—RIGHTS OF PURCHASERS.

Where irrigation company's trust deed to secure its bonds intended its sales of its lands and water rights, and that the proceeds should pay the bonds, the contracts were subject to the trust deed, and they, or the lands subject thereto, might be sold thereunder, in which case the rights of purchasers under their contracts would survive foreclosure, and the purchaser on foreclosure would take the contracts and the lands subject thereto.

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. BANKRUPTCY ⚖⟹254—NOTES AND MORTGAGES BELONGING TO THE ESTATE
—RIGHTS OF TRUSTEE.

Purchase-money notes and mortgages for lands sold by an irrigation company, but not released from the operation of its trust deed to secure its bonds, in the possession of its trustee in bankruptcy, who was unable to perform its contracts, were valueless, and he was required to return the notes and cancel the mortgages, and to return any collections made by him for application on the bonds.

9. MORTGAGES ⚖⟹131—AFTER-ACQUIRED PROPERTY—TRUST DEED.

Where an irrigation company mortgaged its realty and personalty, including notes and mortgages and after-acquired property, and lands subject to the trust deed were sold and released as provided therein, and the company, by purchase at foreclosure sales or by conveyance and satisfaction of such notes and mortgages, was revested with title, they were covered by the trust deed.

10. WATERS AND WATER COURSES ⚖⟹247(2)—IRRIGATION COMPANY—SALE OF WATER AND SERVICE—INJUNCTION.

Under an irrigation company's sales of lands and water rights, amounting to a composite sale of water and service, not dischargeable without the grantees' consent, the grantees could enjoin the company from like grants in excess of the capacity of its water supply and distribution system.

11. WATERS AND WATER COURSES ⚖⟹247(2)—IRRIGATION COMPANY—MORTGAGE—SALE OF WATER RIGHTS BEYOND CAPACITY—EVIDENCE.

In a suit in equity between the trustee under an irrigation company's trust deed to secure its bonds and the company and purchasers of its lands and water rights, seeking to enjoin a further sale of water rights, evidence *held* not to show that the company had sold rights in excess of its supply and distribution system.

12. WATERS AND WATER COURSES ⚖⟹256—IRRIGATION COMPANY—SALE OF LANDS AND WATER RIGHTS.

Where an irrigation company contracted to deliver at its head gates, to main or branch canals, which in its judgment were most convenient to convey water through laterals to the users' lands, not in excess of a certain amount, its judgment, if honest and consulting the convenience of users, would control, and otherwise its judgment might be controlled by the courts.

In Equity. Suit by the First Trust & Savings Bank and others against the Bitter Root Valley Irrigation Company and others, with intervention by one McKinnon and another. Decree for complainants.

Winston, Payne, Strawn & Shaw, of Chicago, Ill., and Henry C. Stiff and Philip S. Brown, both of Missoula, Mont., for plaintiffs.

D. S. Wegg, of Chicago, Ill., Geo. T. Baggs, of Stevensville, Mont., and R. F. Gaines, of Butte, Mont., for defendants.

Gunn, Rasch & Hall, of Helena, Mont., Wm. L. Murphy and Wm. Wayne, both of Missoula, Mont., and S. W. Swabey, of Chicago, Ill., for interveners.

BOURQUIN, District Judge. This is trial of the merits of the trust deed foreclosure referred to in Knudsen v. First Trust & Savings Bank, 245 Fed. 81, 157 C. C. A. 377, and First Trust & Savings Bank v. Bitter Root Valley Irr. Co. (D. C.) 237 Fed. 733. It is in two parts, the first of which is between the trust deed trustees, plain-tiffs, the grantor in said deed, and its trustee in bankruptcy, defend-

⚖⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ants, and intervener McKinnon, claimant of some of the property involved. It has been tried, argued, briefed, rebriefed, decided, reopened of the court's motion, reargued, and rebriefed. All parties admitted lack of preparation for trial, and an important case has been indifferently presented.

[1, 2] An amended answer, tentatively received during trial, "more in detail," is now rejected to the extent found to deny former admissions and to raise new issues operating as a surprise. The trust deed was executed in 1909, by defendant corporation, upon all its real and personal property, with some exceptions, owned and after-acquired, embracing lands, water rights, irrigation system, franchises, contracts of purchase and sale of lands, notes and mortgages, and other property. It was to secure a bond issue of $1,375,500, payable in installments, of which $975,500 are unpaid and due.

The issues of this first part of the trial are sufficiently indicated by what follows. It is now found that a local statute, which seems to have escaped all counsel's notice, authorizes mortgages of after-acquired property, and so the trust deed is valid in respect to such property. It is also found that another local statute, to which no counsel referred save for plaintiffs in the last of their series of briefs, provides corporate mortgages of personal property are governed by the law of real mortgages, save to be accompanied by the good-faith affidavit of chattel mortgage law. The trust deed complies therewith, and so is valid, although not filed nor renewed as a chattel mortgage, contrary to the former decision herein.

[3] A large part of the property description in said deed is general only, but this satisfies the law of real mortgages. See Wilson v. Boyce, 92 U. S. 325, 23 L. Ed. 608.

[4] The trust deed provides that from time to time lands and water rights sold by the irrigation company will be released from the said deed, within 90 days thereafter the company to deposit with the deed trustees first lien purchase-money notes and mortgages for and upon said lands in amount not less than $42 per acre, any excess thereof to be retained by the company and as its property. When the company was adjudicated a voluntary bankrupt on January 3, 1916, it owned contracts for lands sold, but not released from the trust deed, upon which were yet due several hundred thousand dollars and in excess of $42 per acre. It had conveyed some of these lands to its grantees, and received in payment purchase-money notes and mortgages. In its behalf, and that of its estate in bankruptcy, it is contended the trustee of said estate is entitled to all the sale price of all said lands in excess of $42 per acre; that he may either deposit $42 per acre of said notes and mortgages with the trust deed trustees, and compel release of the said deed, or he may in all cases collect all thereof and the sale price, pay said trustees $42 per acre, and retain all the excess for general creditors.

The court sustained this contention in its decision heretofore rendered, but is now constrained to recede. The trust deed contemplated a going concern selling lands, paying bond installments, and keeping all its contracts with the trust deed trustees and purchasers of lands.

No doubt, as long as the company did so, not only purchasers, but the company itself, could secure—even compel—releases of lands sold, on payment of $42 per acre to the said trustees; the purchasers paying any excess to the company. But it defaulted in payment of the bond installment due January 1, 1916, was and is insolvent, ceased business, was adjudicated bankrupt, and no longer can perform any of its contracts. Certainly it is in no position to compel the trust deed trustees to perform provisions of the said deed for its benefit; it refusing performance of its dependent covenants of said deed for the said trustees' benefit.

[5] The trustee of its estate in bankruptcy succeeds to the company's rights in the premises, but subject to its liabilities. He takes its contracts and can compel their performance, provided he performs them upon the company's part. Here he admits his inability to do so, admits insufficiency of assets to pay the bonds, and for those reasons abandons the mortgaged property to this foreclosure.

[6-8] The trust deed is an entire contract, that could be performed in installments. By reason of default, all bonds became due, and the trustee in bankruptcy is bound now to pay all bonds and secure release of all lands or none. This is familiar law of contracts, even when bankruptcy has supervened. The rights of the purchasers of lands are another matter. These contracts of sale were intended by the trust deed; their proceeds were to pay the bonds; they are of the property subject to said deed; they are being foreclosed on herein; they and the lands subject to them will be sold as the trust deed provides, as an entirety. Accordingly it is clear the rights of the vendees therein survive foreclosure sale, and the purchaser at said sale takes the contracts and lands, the latter subject to the former. In so far as purchase-money notes and mortgages for lands sold, but not released as aforesaid, are in possession of the trustee in bankruptcy, although not subject to the trust deed, in that the latter provides only those are that are "required to be deposited" with the trustees within 90 days after release of lands from the trust deed, they are valueless to the estate in bankruptcy. The trustee in bankruptcy cannot realize upon them.

Unable to perform the company's contracts with the makers of said notes and mortgages, he cannot require them to perform—to pay. Said makers obliged to pay all due upon said contracts to the trustees of the trust deed, or to the purchaser at foreclosure sale, it is the duty of the trustee in bankruptcy to return said notes and to cancel said mortgages. In so far as he has collected thereof, as trustee or as receiver herein, the receipts are due to the receivership and to the bonds. These collections are principal, not income. Obviously, if the trustee had collected all due, it must go to pay the bonds secured by the trust deed and lands.

[9] The doctrine of equitable conversion has no application, being contrary to the intent of the trust deed. Some lands subject to the trust deed were sold and released as in the deed provided. Of some of them the corporation again became owner, in part by purchase at foreclosure sale upon its vendees' purchase-money notes and mort-

gages, and in part by vendees' conveyances in satisfaction of such notes and mortgages. The corporation, divested of title and ownership, thereafter was revested therewith, and so "hereafter acquired" the lands within that broad and general term in the trust deed, resubjecting the lands to said deed. In so far as they or any other of the corporation's lands were conveyed to intervener McKinnon, it was by way of security only; and he took with notice and subject to the trust deed. The corporation stock, evidence of water rights and supply for lands subject to the trust deed, is appurtenant to the land, of the nature of real property, and subject to the trust deed, though in possession of McKinnon as security, but with notice.

The second part of the suit is between plaintiffs and interveners, purchasers of lands and water rights from the company, and which are of the lands and irrigation system of the trust deed. These interveners seek determination of the extent of their rights and to enjoin further sale of water rights. It appears that at and prior to the execution of the trust deed the company was incorporated to buy, develop, and sell lands and water, and was engaged therein. Its contracts of sale and deeds provide as follows:

"1. The company agrees that it will construct, equip, maintain, and operate an irrigation system, consisting of a main canal and such branch canals, works, and appliances as in its judgment are deemed necessary, for the purpose of supplying, with other lands, the said land hereby conveyed, or so much thereof as is capable of irrigation by gravity flow, with water in the quantity hereinafter provided for.

"2. The company shall, at its own cost and expense, construct and maintain a suitable gate or other device in the bank of the main or branch canals for measuring and delivery of water, at such point as in its judgment is the most convenient for the conveyance of water to said land, and the manner for measuring, regulating, and delivering the supply of water to said purchaser shall be prescribed by the company, and the action of the company therein shall be final as between the parties hereto. The measurements of said water made by the company shall govern in all cases and shall be final and binding. Said gate is to be and remain the property of the company and subject to its control, and after delivery of said water at said gate it shall be conducted therefrom by the purchaser at his own cost and expense and entirely at his own risk; and the purchaser shall, at his own proper cost and expense, subject, however, to the control and supervision of the company, dig, build, maintain, and operate all lateral ditches that are or may become necessary to carry or conduct water from said system, at said point, onto and across his said land. And in case any purchaser or purchasers owning lands intervening the land of the purchaser and the said delivery gate shall fail or neglect to construct a supply ditch across his or their respective lands, then and in that event the purchaser shall have the right to enter upon such intervening land for the purpose of constructing, repairing, and maintaining a supply ditch, and the company shall designate the location of said proposed ditch upon request; it being the intention that supply ditches, other than main and branch canals, shall be constructed and forever maintained by the grantee, of a size sufficient to irrigate lands below the parcel herein described and dependent upon such supply ditch, and that in case of the failure of any purchaser or purchasers to construct and maintain his or their portion of such supply ditch, any other purchaser dependent on the construction and maintenance of such portion may enter upon said land and construct such portion at the cost of the grantee, the location and size thereof having been first determined by the company.

"3. The company shall, at all times, have the right to enter upon the above lands of the purchaser to survey or construct laterals necessary for the

distribution of water to its purchasers, and the company shall have the right to use any ditch or lateral on the land hereby sold, whether the same be constructed by the purchaser or the company, and may enlarge the same for carrying water over and across the lands to other parties, provided that in so doing it does not interfere with the use of said ditch by said purchaser. No such ditch or lateral shall exceed four feet in width at the bottom.

"4. The purchaser hereby agrees to purchase of the company, and the company hereby agrees to sell to the purchaser, the perpetual use of sufficient water for the irrigation of all that portion of the land hereby sold which may prove to be susceptible of irrigation from said system by gravity flow, and for stock and domestic purposes incident thereto; said water to be supplied by the company between the 15th day of April and the 15th day of October of each year: Provided, however, that the water so used by the purchaser shall not exceed a maximum quantity of two and one-half acre feet for each acre of said land during said period, and provided, further, that not more than one-half an acre foot of water shall be used on each acre of said land during any one calendar month.

"5. The purchaser agrees to pay, on the first Monday of November, of each year, to the company, at Hamilton, in the state of Montana, an annual water maintenance charge of $1.25 per acre for all of said lands capable of being irrigated as aforesaid; but it is agreed and understood that the company shall be entitled to charge, collect, and receive from the purchaser a minimum water maintenance charge of $10 for furnishing said water—it being expressly understood that this provision and agreement is a covenant running with and binding upon such lands, and the purchase price of said water right and annual maintenance shall be a charge and lien upon said land, with the appurtenances thereto, and the same may be enforced and foreclosed in any court of competent jurisdiction, according to the laws of the state of Montana, and, in addition to the right to foreclose such lien, the company may, at its option, in case of the failure of the purchaser to pay said amounts as they respectively mature, including said annual maintenance charge, refuse to furnish water for the irrigation of said lands and for stock and domestic purposes thereon, until such amount in default shall have been paid, and all overdue payments, either on water right, interest thereon, or for maintenance fee, shall draw interest from maturity at the rate of 10 per cent. per annum.

"6. It is agreed that the purchaser shall use the water to be supplied by the company to irrigate the lands hereby sold, and for stock and domestic purposes incident thereto, and for no other purpose whatever, and that said water will not be permitted by the purchaser to be used on any land, except the land hereby sold, nor permitted to run off on contiguous land, nor to spread out in low places on said land, nor in any manner to run to useless waste. The purchaser will, without expense to the company, upon demand of the company, construct necessary ditches to convey any surplus water back to the main canal, or some lateral thereof: Provided said lateral may be reached by gravity flow by a ditch from the lowest point of the above-described land, and provided the same may be conducted into said main canal or some lateral thereof, within 1,500 feet from such lowest point, and failing so to do the company may, at the expense and cost of the purchaser, enter upon said land and construct and maintain such ditch or ditches, and that such expense and cost of constructing and maintaining such ditches shall be and become a lien on the land of the purchaser, and may be foreclosed by the company in the manner provided by law for the foreclosure of liens of mechanics and others.

"7. The company shall have the right to shut off the water from said canal or any of its laterals for the purpose of repairing the same at such time as urgent necessity may require, but during irrigation season shall restore the water as speedily as the nature of the case may permit.

"8. The company shall not be liable for scarcity of water caused by unlawful or unavoidable obstruction, hostile diversion, forcible entry, drought, flood, accident, or casualty; but the company shall use due diligence in pro-

tecting its canal and irrigation system and keeping the same in proper operation and repair.

"9. It is mutually understood and agreed that the right hereby conveyed and the water to be furnished hereunder shall form a part of the appurtenances to said land,.and that the right thereto shall be transferable only with said land and shall run therewith.

"10. The company shall have the right to sell water under the line of the canal herein contemplated to an amount equal to the total carrying capacity of said canal. If for any reason there should be any shortage in the water delivered by said canal during the irrigation season, then the amount of water herein contracted to be sold to the purchaser shall be in such proportion of the aggregate quantity of water in said canal as the amount of water hereby purchased bears to the full amount called for under all water rights sold by the company, and the purchaser shall receive water in that proportion."

The irrigation system, so far as herein involved, consists of a reservoir, a main canal 70 miles long, and branch canals and laterals 140 miles long. In addition are several streams that discharge into the main canal. Of lands irrigable from it, the company has sold 18,210 acres with use of water as aforesaid, and 10,259 acres to 19,657 acres of these and other lands of the company have been supplied by it with water from 1910 to 1917, both inclusive. If these sales had been unqualified, interveners' contention that, when sales equaled the water owned by the company, its interest in the water rights and irrigation system would vest in its grantees the system as a necessary instrumentality to enjoyment of land and water, and in the nature of appurtenant to both, might be conceded.

[10] But the case is otherwise. Of the water only a limited use is granted in perpetuity. The company virtually retains a reversion, the water not used, the excess, seepage, and waste always, and the whole for six months in the year. Of the irrigation system the company grants nothing, other than by its grants of lands and water it impresses said system with the duty of service to the grantees in respect to said lands and water, of the nature of an easement. In brief, the company's grants of water are a composite of water and service, so far a property interest in the water rights and irrigation system that these latter cannot be discharged from their obligation to the grantees without the latter's consent, under any circumstances. Whatever be the precise interest of said grantees, their right is to be protected therein; and to that end the grantor can be enjoined from like grants in excess of the capacity of water supply and of the system to distribute it. See Twin Falls, etc., Co. v. Caldwell, 242 Fed. 193, 155 C. C. A. 17; Amidon v. Harris, 113 Mass. 59.

[11] It does not appear, however, that the company has sold to capacity. Practically without conflict the evidence is that the reservoir capacity is 34,000 acre feet; that the requirements can be more than met to July 15th, and the reservoir still full; that from July 15th to October 15th the run-off into the reservoir is 12,000 acre feet or more; that the canal will carry 300 second feet; that the seepage loss therein is 22 per cent., and some additional loss in branch canals and laterals; that the reservoir can be discharged into the canal 100 per cent., pickups offsetting any loss at headgate; that irrigation in the main ceases about September 10th, the demand thereafter being but for hay, or-

chards, and stock; that after October 1st the water is devoted to but stock (Powell's tables indicate user of about 3.5 acre inches in September, and .6 acre inch in October); that the system has been in operation eight years; that there is no organization to efficiently control and distribute water, no rotation in its use, no method, no measurement, any and all users taking water when it suits them and in quantity desired; that time and experience and method enlarges the duty of water; that some users have failed to secure sufficient water. It needs no close analysis hereof to demonstrate that the water and system in normal years (the test) will suffice for all the company's obligations in respect to more lands than it has sold and more than 25,000 acres.

[12] From July 15th to September 15th the water to the head of the canal is at least 42,000 acre feet. Thereafter, run-off and pick-ups are practically sufficient for requirements. The obligation of the company is to deliver during that period, July 15th to September 15th, all reasonably necessary to reasonably diligent use, but not in excess of one acre foot per acre. This it is to measure and deliver at its headgates in the main or branch canals, where in its judgment is most convenient for conveyance of the water by the user through laterals to the land. Its judgment controls, but it must be honest judgment; consulting, not its convenience, but that of the users of water; and this requires that by main and branch canals the water be delivered so near the land of water users that therefrom the latter can convey it upon their lands with reasonable labor and expense, and without unreasonable loss by seepage. Any failure of the company therein can be remedied, any dishonest judgment controlled, by the courts. That in the past the company constructed laterals and delivered water on the lands is a gratuity, not obligating it to continue. It can stand upon its contract. Therein the purchasers at foreclosure sale will succeed to all the company's rights and obligations. 42,000 acre feet at the canal head ought to afford more than 25,000 acre feet at said headgates, allowing 30 per cent. loss by seepage to those points. The data at hand is insufficient for accuracy, but establishes no right to injunction at this time; and that is all that is decided in respect to capacity, so greater accuracy is not vital.

Interveners may proceed anew whenever necessary to their protection. In reference to the contention that the company has failed to fully perform its contracts, and it or its successor may continue to fail, may find operation of the system unprofitable and abandon it, doubtless in so far as there is a remedy it may be secured in proper proceedings. It cannot change relations nor status nor relief in this suit. The hazard attaches to all contracts for service and easement with maintenance. All who bargain for the like risk such eventualities. If action for damages are inadequate, they might eventually result in execution sale and purchase of water rights and system by water users. Abandoned, they could possess and operate the sytem. As in like cases their principal reliance is that the water rights and system cannot be released from their claims or interest therein, nor diverted from their service, without their consent.

Decree in accordance herewith will be entered.