[Sac. No. 3111. In Bank.—February 28, 1921.]

BUTTE COUNTY WATER USERS' ASSOCIATION (a Corporation), et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[1] WATER CORPORATIONS—SHORTAGE OF WATER—PRORATING SUPPLY AMONG CONSUMERS—VALIDITY OF LEGISLATIVE ENACTMENT OF 1913.—The provision of section 6 of the act of April 25, 1913 (Stats. 1913, p. 84), that as between consumers who have been vol-

---

1. Right of appropriator of water for distribution to the public to grant exclusive or preferential rights to individual, note, 29 **L. R. A.** **(N. S.)** 213.

untarily admitted to participate by a public utility water company in its water supply, there shall be no priority or preference in times of shortage, and in such times the company shall be required to apportion such supply ratably among its consumers, is valid.

[2] ID.—STATUS OF CONSUMERS—PRORATING OF WATER.—As between the regular consumers of a water company supplying water for irrigation, the earlier consumers have no vested right to water in preference to later consumers, and in times of a shortage of water there should be a prorating between them all.

[3] ID.—SURPLUS CONSUMERS—INAPPLICABILITY OF RULE.—The rule as to prorating of water among regular consumers in times of shortage has no application as between such consumers and consumers whom the company undertakes to serve only when it has a surplus of water over and above the needs of its regular consumers.

[4] ID.—RELATIONSHIP OF CONSUMERS—ACTUAL DELIVERY OF WATER NOT ESSENTIAL.—Where owners of land have contracted with a water company for service of water for irrigation purposes, such owners become consumers, if the company has authority to admit them as such, and it is not necessary that water be actually delivered upon the lands to make them consumers in the legal sense.

[5] ID.—NEW CONSUMERS—RIGHT OF WATER COMPANY.—A public water company has authority to take on new consumers without, though not against, an order of the Railroad Commission, since the act of 1913 placing water companies under the jurisdiction of such commission does not require the permission of the commission.

[6] ID.—LIMITATION OF RIGHT AS TO NEW CONSUMERS.—A water company supplying water for irrigation has not the power to take on new customers after the demands of its consumers upon it have reached the limit of its supply.

[7] ID.—ADMISSION OF NEW CONSUMERS—JUDGMENT OF WATER COMPANY.—The matter of taking on new consumers is one of judgment, which in the absence of any regulatory order of the Railroad Commission is left to the water company, and if the judgment is reasonably exercised, the action of the company in admitting new consumers is valid.

[8] ID.—REASONABLE ACTION OF WATER COMPANY—FINDING OF RAILROAD COMMISSION—WHEN CONCLUSIVE.—In a proceeding in *certiorari* to annul an order of the Railroad Commission requiring a public service water company to serve new consumers with water, the finding of the commission that the water company had acted reasonably in admitting such new consumers is conclusive where there was evidence to support the finding.

4. Construction of contracts to furnish water for irrigation purposes, note, L. R. A. 1916A, 257.

PROCEEDING in Certiorari to annul an order of the Railroad Commission directing the apportionment of water. Order affirmed.

The facts are stated in the opinion of the court.

George F. Jones, Elmer W. Armfield and Arthur B. Eddy for Petitioners.

Hugh Gordon for Respondent.

Isaac Frohman and Douglas Brookman for Sutter Butte Canal Company.

OLNEY, J.—This is an application by an association of those consumers of the Sutter Butte Canal Company, who were consumers prior to 1920, to annul an order of the Railroad Commission that, beginning with the year 1920, that company serve with water some fourteen thousand four hundred acres of land not theretofore served by it. The company was organized as, and has always been, a public utility company supplying water for irrigation, and its articles of incorporation empower it to sell and distribute water in the counties of Butte and Sutter. It takes its water from the Feather River near Oroville, in Butte County, and its water rights, which are appropriation rights, are all for water for public sale and distribution. From a comparatively small beginning the system of the company was extended and enlarged gradually as the market for its water grew until in 1919 it was supplying some fifty-five thousand, or slightly more, acres of land, mostly in Butte County. In September of that year the company contracted with the owners of fourteen thousand four hundred acres of land in Sutter County that it would extend its system to supply their lands, and pursuant to this contract the company made the necessary enlargements and extensions of its system, at a cost to it of between two hundred thousand dollars and two hundred and fifty thousand dollars. The making of this contract, the enlargement and extension of the company's system, and the purpose of the company to serve the fourteen thousand four hundred acres of additional lands were, the commission finds, a mat-

ter of common knowledge in the region served by the company. Nevertheless, no objection was made to the company so doing. The company's rules require that applications for water for the ensuing year be filed by the first of January, and by that date in 1920 the owners of the fourteen thousand four hundred acres had filed their applications and paid the company's regular charge. The three preceding winters had been winters of light rainfall, and the winter of 1919–20 was exceptionally dry, so that by spring it became evident that there was a serious danger of a water shortage. The company's old consumers, through the instrumentality of their association known as the Butte County Water Users' Association, thereupon filed a complaint with the commission against the company, alleging in brief that the company would not have water enough to irrigate both their lands and the fourteen thousand four hundred acres of additional lands, and asking for an order of the commission directing the company not to supply the latter. The company answered the complaint, and the owners of the fourteen thousand four hundred acres on their part organized themselves into an association known as the Sutter County Water Users' Association, and intervened in the proceeding, alleging that they had been accepted by the company as consumers, and in reliance thereon they had prepared their lands at large expense for the raising of rice by irrigation, and asking for an order from the commission directing the company to serve them. The owners of certain of the fourteen thousand four hundred acres also intervened in their individual capacities in opposition to the complaint of the old consumers.

The matter was promptly heard and decided by the commission, its order being handed down on April 21, 1920. At that time, of course, it was not possible to know with exactness just what water conditions during the summer to come would be. The commission's decision finds that the fourteen thousand four hundred acres were within the area which the water company was organized to serve and for serving which it had made its water appropriations; that in a normal year the company's supply of water was adequate for the needs of the fourteen thousand four hundred acres as well as for those of the lands theretofore served; that at the time the contract between the company

and the owners of the fourteen thousand four hundred acres for the supply of those lands was made, and at the time the applications of those owners for service were presented and accepted, it was reasonable to expect that the company would have a sufficient supply for all during the ensuing year, and the company was justified in accepting the applications. The critical month in supplying water by the company's system, that is, the month when the demands for irrigation are most apt to approach or exceed the available supply, is the month of August. The commission found that at the time of hearing, that is, in April, it appeared that the company would, so far as could be determined, have in August sufficient water from its then existing supply to irrigate seventy thousand acres (all the land) for from eighty to ninety per cent of the time, and in addition could obtain a further substantial quantity under a. water right which it had recently obtained for the diversion from the Feather River of some additional five hundred second-feet. Upon the facts so found, the commission held in effect that the owners of the fourteen thousand four hundred acres had the status of consumers of the company and were entitled to be served, and made its order that they be served on an equal basis with the company's other consumers. The reasons of public policy underlying its decision, the commission states as follows:

"It would be uneconomical, and would retard the development of this state if an irrigation company were restricted in its delivery of water to only that area for which it would have a sufficient supply in the driest years. A restriction such as this would prevent the cultivation of large areas of land which would otherwise be cultivated and produce a crop a very large proportion of the time. As a matter of fact, years of drought such as this do not ordinarily occur more frequently than from ten to twenty year periods, and it would be unjustly restricting the expansion of the agricultural pursuits of the state if a company were permitted to serve only the area for which it would have available water during years of extreme drought and consequent minimum water supply.

"Applicants applying to a utility for an extension of service, whose applications are accepted in good faith by the utility at a time when it could reasonably expect to

have available a sufficient supply of water in addition to that needed for the lands theretofore served, should in justice receive their ratable proportion of the available supply if a shortage occurs, even though that shortage may occur prior to the actual delivery of any water to them.''

After the decision, the old consumers petitioned the commission for a rehearing, and, being refused, commenced the present proceeding before this court for the annulment of the commission's order. The contentions of the petitioner are three in number. The first, as stated by its counsel, is as follows:

''The orders of the Railroad Commission do not make any provision for the supplying of prior consumers before the fourteen thousand four hundred acres are taken care of. On the contrary, said orders specifically direct the Sutter Butte Canal Company to prorate the available supply in the event of a shortage. The effect of this order is to deprive petitioners of property without due process of law and without compensation.''

Assuming that the owners of the fourteen thousand four hundred acres had entered into relationship with the company as consumers, the ground so stated is not so much an attack on the commission's order as it is on the validity of a statute adopted by the legislature. It may well be that in advancing this ground of attack petitioner's counsel do not make the assumption stated, but their position on the point is not entirely clear, and it will make clearer what we believe to be the real point in the case, if we make the assumption. Assuming, then, that the owners of the fourteen thousand four hundred acres had entered into relationship with the company as consumers, the contention of the petitioner is that the old consumers of a public utility water company have a vested right to water in preference to new consumers, so that in case of a shortage the water is not to be prorated, but the old consumers take all they require and the new consumers get only what is left. But the act of April 25, 1913 (Stats. 1913, p. 84, Deering's Gen. Laws, Act 4348a), which places water companies under the jurisdiction of the Railroad Commission, provides in section 6 that ''as between consumers who have been voluntarily admitted to participate by the corporation in its supply of water or been required to be supplied by an order

of the Railroad Commission, in times of shortage there shall
be no priority or preference, and such corporation in times
of shortage shall be required to apportion such supply rata-
bly among its consumers.''

[1] If the foregoing provision of the statute is valid,
manifestly the order of the commission in this case is valid,
so far as the ground of attack under consideration is con-
cerned, for the order is merely in accord with the explicit
direction of the statute.    The statute is attacked only
through the attack upon the order of the commission, that
is, inferentially, but the only ground upon which it can be
attacked, and the only ground upon which it is attacked,
even inferentially, is that the consumer of a public water
company has a vested right, not merely to service from the
company, but to service in full in preference to later con-
sumers, so that the respective rights of the company's con-
sumers are ranked, as it were, in the order of time in which
they have become consumers.    This is rather a novel doctrine
and one whose statement alone is well-nigh sufficient for
its rejection.    In fact, it is not stated by petitioner's counsel
as we have stated it.    It is said merely that the right of a
consumer, particularly of a consumer taking water for irri-
gation of his lands, is a vested right of which he cannot be
deprived by the diversion of water to others.    This propo-
sition is undoubtedly correct, so far as a diversion to other
objects or to persons not consumers goes, but it does not
support the contention that as between consumers one has
a vested preference over another in times of a water shortage.
No authority supporting that contention is cited, and we
doubt if any can be found.    It is a contention directly
contrary to the principle upon which *Leavitt* v. *Lassen Irr.
Dist.*, 157 Cal. 82, [29 L. R. A. (N. S.) 213, 106 Pac. 404],
was decided, and wholly opposed to the fundamental prin-
ciple that a public utility must hold itself out as ready to
serve and must serve the public or its portion of the public
without discrimination or preference other than such as
corresponds to differences in the value or cost of the service
rendered.    It has taken years of struggle in this country
to establish this principle and to compel its general observ-
ance, as witness the long struggle against discrimination by
transportation companies.    But it is now thoroughly es-
tablished and its value recognized, and every reason of pub-

lic policy supports it. In particular, in connection with a water company supplying water for irrigation, it would be most unjust and very injurious to the state to hold that in times of shortage the older consumers could have a full supply and the later none. In many instances, such a rule would mean, as to the later consumers, not only that their crops for the year would be lost, but that their orchards or plantings would be destroyed, when by prorating the water the orchards and plantings of all would be preserved with some impairment of crops for the time, but no serious permanent injury. The rule would operate directly to limit, in many parts of the state, the land available for orchard and similar plantings to such as could be certain of a full supply even in times of extreme drought. There is no occasion for any such extreme limitation, and it would be directly contrary to the economic welfare of the state. As between the consumers of a water company, even one supplying water for irrigation, the rule must be that in times of a shortage of supply, the water available must be prorated.

[2] Certainly this is true as to every consumer in the present case who became such after the passage in 1913 of the act referred to. He could get no right greater than was permitted by the law in effect at the time he entered upon the relationship. There is no allegation in the present case that any of the water company's present consumers became such prior to 1914, and no right is claimed by reason of any of them having been consumers prior to the passage of the statute. This being the case, it must be held that the order of the commission requiring a prorating is valid so far as the petitioner's first ground of attack is concerned.

[3] What we have just said has, of course, application only to the company's regular consumers, that is, to those who have entered into relationship with it and whom it has undertaken to serve on the basis of its having an adequate supply for that purpose. It has no application as between such consumers and what we may call surplus consumers, that is, consumers whom the company undertakes to serve only when and as it has a surplus over and above the needs of its regular consumers. As between these two classes, and very possibly even as between individuals

CLXXXV Cal.—15

in the second class, a preferential right can properly exist. In no other way can use be made of the surplus water which any irrigation company is apt to have at times.

But in the case now before the court, the new consumers of the water company, if they properly became consumers at all, became such as regular and not as surplus consumers. They were admitted upon the basis of the company having an adequate supply and engaging regularly to supply them. They were, therefore, on an equal footing with the company's older consumers, provided the assumption with which we started is true, that they had properly been admitted as consumers. Whether they had been so admitted is, we believe, the real question in the case. It is directly involved in the second contention of the petitioner.

The petitioner's second contention is stated as follows:

"Concededly the only authority which the Railroad Commission has to make an order in a matter of this kind is that contained in sections 5 and 6 of chapter 80 of the Statutes of 1913. The latter part of section 5 reads as follows:

" 'The commission shall likewise have the power after hearing upon its own motion or upon complaint, to require any such water company to allow additional consumers to be served *when it shall appear that to supply such additional consumers will not injuriously withdraw the supply wholly or in part from those who theretofore had been supplied by such public utility.'*

"This, and this alone, constitutes the authority and the power of the Railroad Commission to make the orders which petitioners ask to have set aside. It is respectfully submitted that there is nowhere in the opinion or the orders under review, in the evidence at the hearing, or in any part of the record a determination, a finding or a statement of any kind that the supply of water available to the Sutter Butte Canal Company during the year 1920 and thereafter will be sufficient to allow additional consumers to be served *without injuriously withdrawing the supply in part from those who theretofore have been served by said utility.* On the contrary, it affirmatively appears in the evidence and upon the face of the Railroad Commission's opinion, that the old consumers *will be injuriously affected* by the delivery of water to the fourteen thousand four hundred acres which has not heretofore been supplied with water. In fact, the com-

mission recognizing from the evidence that this result will undoubtedly follow makes explicit provision for a prorating of the short supply.''

Epitomizing this, it is that the commission's only authority in this case was to make an order allowing additional consumers to be served only when it appeared that the former consumers would not be injuriously affected thereby, and that it affirmatively appeared, and the commission found, that there was going to be a shortage of the company's supply during the coming summer, so that it of necessity appeared that the former consumers would be injured by admitting others to share in the supply.

We are not certain that the commission's finding was really that the company's supply would not be adequate during the summer to follow for both the new lands and the old. Its finding is that at the intake of the company's canal there would be enough water available in the critical month of August for from eighty to ninety per cent of the time to irrigate all the lands, and that in addition the company had a permit from the State Water Commission for the diversion of five hundred second-feet from the Feather River at a point about twelve miles below, where a substantial quantity could be obtained. Nor are we certain that if this finding be one that, with the additional right of diversion mentioned, there would be no shortage, it is without support in the evidence. It was a case where the supply in normal years was more than adequate, and where it was sought to foretell, as well as possible the extent to which that supply would fail during the particular summer because of an exceptionally dry winter just coming to an end. It was largely a matter of guessing, and it would be difficult to say that the commission's guess that the company would have an adequate supply with what it could get by the further diversion it was authorized to make was so unreasonable as to be without support in the evidence. But however this may be, we may grant for purposes of discussion the contention that it did appear at the time the commission made its order that because of the drought the company's supply would not be fully adequate during the summer for both the new and the old consumers, and that the commission so found. Even so, it does not follow that the commission's order was without authority.

The argument for petitioner assumes as its basis that the owners of the fourteen thousand four hundred acres of land were not consumers at the time of the application to the commission, and that therefore the commission's order directing that they be served was in effect an order that they be admitted as consumers, made under the authority of the provision of the statute quoted in the statement of petitioner's position. But the order of the commission was not in fact that. It was not made on the basis of the owners of the new lands not yet being consumers, but on the basis that they were already consumers, and was not an order that new consumers be admitted, but that con-. sumers already admitted, but at a later date than the company's other consumers, be served without preference against them. In its opinion denying the petitioner's request for a rehearing, the commission placed its order explicitly upon this ground. If it be true that the owners of the new lands had already been admitted as consumers, then in accordance with our discussion of the petitioner's first contention it would follow that they were entitled to be served without preference, and the commission's order was not only correct but the only one which it could legally make. The order must be upheld, therefore, unless it appear that the owners of the new lands were not consumers at the time of petitioner's application to the commission.

The facts in the matter are, as we have said, that in September, 1919, the company and the owners of the new lands contracted for service for those lands; that the company thereupon extended its system and the owners prepared their land, both at very considerable expense; and that prior to January 1, 1920, pursuant to the company's rules, the respective owners had made application to it for water for the ensuing year, and those applications had been accepted, and the owners had paid the company's charges. [4] These facts are not disputed, and upon them certainly the owners had become consumers, provided only the company had authority to admit them as such. It was not necessary that water be actually delivered upon the lands, to make the owners consumers in the legal sense, that is, persons whom the company was obligated to serve. The relation of public utility company and consumers was established as soon as the company came under obligation to

serve and the owners came under obligation to take. Both these obligations had been assumed by the respective parties by January 1, 1920, so far as they could assume them. The actual delivery and receipt of the water thereafter would follow as a mere incident of the relation that had been entered upon. Unless, then, the company did not have the right to enter into this relation with the owners of the new land, the relation was in existence and those owners were consumers of the company prior to the petitioner's application to the commission, and were entitled to water on an equal footing with the company's other consumers. The question, then, reduces itself to one as to the authority of the company, not of the commission, to admit these new consumers.

[5]  It is evident, we think, that on the one hand a public water company has authority to take on new consumers without, though not against, an order of the commission, and, on the other hand, its authority is not without limitation, even in the absence of any order of the commission. Certainly, in the absence of some prohibition upon it, either by statute or by order of the commission, a water company, like any other utility, has the general power to take on new consumers. There was no prohibition by order of the commission, nor was there any prohibition by statute, unless it be that the act of 1913 referred to provides that a water company may not take on new consumers without an order of the commission. But the act does not in fact so provide. It provides merely that the commission may forbid the taking on of more consumers, or may order their taking on, but it does not purport to limit or change the usual authority of the company in the absence of any order by the commission. This is evident from a reading of the entire section (section 5) of the act which is pertinent to the point. It reads:

"Whenever the railroad commission, after a hearing had upon its own motion or upon complaint, shall find that any water company which is a public utility operating within this state has reached the limit of its capacity to supply water and that no further consumers of water can be supplied from the system of such utility without injuriously withdrawing the supply wholly or in part from those who have theretofore been supplied by such corpora-

tion, the railroad commission may order and require that no such corporation shall furnish water to any new or additional consumers until such order is vacated or modified by the said commission. The commission shall likewise have the power after hearing upon its own motion or upon complaint, to require any such water company to allow additional consumers to be served when it shall appear that to supply such additional consumers will not injuriously withdraw the supply wholly or in part from those who theretofore had been supplied by such public utility.''

[6] On the other hand, a water company supplying water for irrigation has not the power to take on new consumers without limit. Its power to supply water is, of course, limited by the amount of its supply, and when the demands of its consumers upon it have reached this limit, it has no right to take on new consumers to the necessary injury of those it has. But it is not always easy to determine just when the limit of supply is reached, and the factor of safety which should be allowed against exceptional seasons may vary from locality to locality. In those localities where the crops are wholly dependent upon irrigation and perish if deprived of it for any considerable period, the factor of safety which should be allowed is of necessity greater than in those localities where this is not true. [7] The matter is one of judgment, a judgment which it may well be should be exercised conservatively, but a matter of judgment nevertheless. The exercise of this judgment is left to the water company in the absence of any regulatory order of the commission, and if the judgment is reasonably exercised, the action of the company in admitting new consumers is valid. Upon this point the commission found in the present case that the company had acted reasonably in admitting the owners of the fourteen thousand four hundred acres as consumers, and if this finding is sustained by the evidence, it is decisive of the case.

It may be claimed with some truth that the commission based this finding in part upon the fact that the normal flow of the Feather River available to the water company, that is, the flow in the critical month of August, averaged over a period of years, is sufficient to supply both the company's old and its new consumers. It may also be claimed, and is in fact claimed, that such an average is not the true

limit of the extent to which a water company may take on new consumers, that in effect there must be a factor of safety allowed against seasons of less than average flow. This claim has great force, which is hardly affected by the casual remarks in some decisions that the limit is the normal available supply (*Blakeley* v. *Ft. Lyon Canal Co.,* 31 Colo. 224, [73 Pac. 249]; *First etc. Bank* v. *Bitter Root etc. Co.,* 251 Fed. 320). It has also, we believe, been the practice of the Railroad Commission in this state to allow some such factor of safety against the normal supply. On the other hand, it is evident that the permissible limit should not be held to the available supply in years of drought. There is no occasion for any such extreme rule. It would virtually destroy the irrigability for anything but annual crops of large amounts of land, when by a temporary prorated diminution in deliveries of water in years of drought such years could be endured without permanent injury or too great loss. (See, also, the opinion of the commission in *Security Inv. Co.* v. *Palermo Land & Water Co.,* 7 Ops. R. R. Com. 180.)

[8] But it is not necessary to make the present case turn on whether it is the normal, in the sense of average, supply, or the normal supply less a reasonable factor of safety for years of less than average supply, which should be taken as the limit to which an irrigation company may take on requirements against its system. What we have said on the point has been largely for the purpose of making clear the utmost position that the old consumers here can reasonably take, and then ascertaining if in view of that position the order of the commission can be upheld. If there was evidence before the commission which justified the conclusion that the company by taking on the new consumers would not increase the demands upon its system beyond the amount of its average supply less a reasonable factor of safety, it is evident that the order must stand; and this, although there may be a conflict in evidence, for it is the function of the commission alone to resolve any conflict, and we can disturb its ruling only when there is no evidence whatever to support it.

The testimony of the engineer for the commission was that the average flow of the Feather River in August for the period from 1902 to 1913 was 1,681 second-feet. The

years subsequent to 1913 showed a very much higher average, but the flow for those years was not considered, since the natural flow was augmented by water stored in the mountain reservoir of the Great Western Power Company and released for power purposes during the summer with the right, or assumed right, at least, on the part of that company to retake it. The lowest flow of the years from 1902 to 1913 was that of August, 1913, when it was only 969 second-feet. The next lowest August flow was 1,350 second-feet.

As to the other side of the balance sheet, the demands upon the company's system which it had assumed by January 1, 1920, the testimony was that they would aggregate 930 second-feet delivered on the lands, and that about one-third should be allowed for loss in transportation, making the amount required to be diverted 1,395 second-feet. Between this amount and the average flow of the river of 1,681 second-feet, there was then a margin or factor of safety of 286 second-feet. In percentages, there was a margin of twenty per cent of the demands upon the system and of seventeen per cent of the average flow. Comparing the amount of demands, 1,395 second-feet, with the flow in the particular years in the period taken to ascertain the average, it appears that with the exception of one year the lowest flow was 1,350 second-feet, or but 36 second-feet below the demands for 1920. This difference could undoubtedly easily be made up by reduction of wastage and by economies. In other words, the situation when the water company accepted the applications of the new consumers was that the demands upon the company's system could be met from the natural flow of the river for every year but one in the period of eight years prior to the time when the natural flow was augmented by the power company's storage.

There was also evidence justifying the conclusion that instead of 935 second-feet delivered being required to meet the demands for 1920, the amount as called for by the company's contracts and accepted applications was but 884 second-feet. Allowing a loss of one-third in transportation, this would require a diversion of but 1,326 second-feet, and leave a margin of 355 second-feet between the necessary diversion and the average flow of 1,681 second-feet. There

was also evidence that the figure of 884 second-feet delivered should be somewhat reduced for August, owing to the slackening in irrigation after July.

It is not possible, in view of these figures and this evidence, to say that the commission was not justified in finding that the action of the company in taking on new consumers prior to January 1st, and before the dry character of the winter had become apparent, was reasonable and proper, even assuming that a factor of safety below the average flow of the river should have been allowed. The evidence showed that such a factor existed and in a substantial amount. What the factor should be was a matter of judgment for the company in the first instance, and for the commission in the second. It is a factor that must vary from locality to locality and from system to system. It is necessarily higher in extremely arid localities and in localities where the normal fluctuations in rainfall are high, and it is to be noted that Sutter and Butte Counties are not of this character, and that in both crops can be grown and even orchards maintained without irrigation. It is not possible for us to say that the factor in this case was too small.

It should be said that in computing the water company's available supply counsel for the petitioner deduct from the figures we have stated six hundred second-feet diverted by the Western Canal Company, or which that company claims the right to divert. But we do not follow them in making such deduction. There is nothing to show that the right of the Sutter Butte Canal Company is not a prior right so far as the natural flow of the river is concerned, and it does appear that it was diverting water long before the Western Company. It also appears, inferentially at least, that the water claimed by the latter is water the Great Western Power Company stores in the mountains and releases in the summer; in other words, is water which is not a part of the natural flow in summer. It is for this reason, as we have said, that the high average flow in the years subsequent to 1913, when the reservoir of the power company was completed, was disregarded by the commission's engineer in computing the average natural flow.

It should also be said, even at the expense of repetition, that the case was presented to the commission and has been presented to us almost entirely as if the question involved

were one as to the right of the commission to permit the
taking on of new consumers at the time of the hearing, in
face of the coming shortage then apparent. The commission
did not so view the real question in the case, nor do we,
and we express no opinion as to the right of the commission
to permit the taking on of new consumers in a year of
known shortage, even though their being taken on would be
amply justified under normal conditions. The vital point in
the case is that the new consumers had already been taken
on and at a time when there was no reason to anticipate
a drought, and when, according to evidence upon which the
commission had a right to rely, the company could rea-
sonably anticipate that it would have an adequate supply
for both the new and the old consumers. This being the
situation, it is worthy of note again that, while the result
would be the same in the absence of any statute, the case
comes directly within the provision of the act of 1913 that
"as between consumers who have been voluntarily admitted
to participate by the corporation in its supply of water or
been required to be supplied by an order of the Railroad
Commission, in times of shortage there shall be no priority
or preference, and such corporation in times of shortage
shall be required to apportion such supply ratably among
its consumers."

We have discussed the case upon the assumption that
the company had the right under the appropriation under
which it was diverting water and supplying it to the old
consumers to divert the further amount required to supply
the new consumers, if the water were there to divert. This
right is questioned in argument, but the facts, if they exist,
which would negative the right were not shown. It does
appear that the appropriation right claimed by the company
was for one thousand five hundred second-feet. This was
more than enough for both the old and new consumers. If
the company did not in fact have the right to this amount
or the right to divert a greater amount than it had previ-
ously been diverting, that fact should have been shown. The
case as presented to the commission by the old consumers
was practically one where relief was sought against the
company supplying the new consumers on the ground solely
that a shortage in the natural supply due to a season of
extreme drought was threatened. The commission's order

denying relief upon this ground was supported by the evidence presented to it.

The conclusion so reached is decisive of the case, and renders unnecessary the consideration of the petitioner's third contention. It is really a contention by way of reply to one made by the company and the Sutter County consumers. The latter claimed that there had been a previous dedication of water for use on the Sutter County lands because water had in a preceding year been delivered to a small portion of them. The commission found that water had been so delivered, and the third contention of the Butte County consumers was that such delivery was not a dedication of water to those lands. But it is evident, in view of what we have said, that it is wholly immaterial whether this contention be correct or not. The owners of the Sutter County lands had nevertheless been properly admitted as consumers by the water company, and this fact required that they be served without preference against them.

Order affirmed.

Lennon, J., Wilbur, J., Sloane, J., Angellotti, C. J., and Lawlor, J., concurred.

SHAW, J., Concurring.—If the petitioners had shown that the water company had originally, by its declarations to proposed consumers, or by acts evincing to them an intention to that effect, held out that it proposed to use its water supply, so far as was necessary, for irrigation and other uses upon a definite area or district of farming land, embracing the lands of such consumers, including the petitioners, and that in pursuance of this purpose it had constructed a system of canals extending to said lands and no further, and had obtained consumers in that district on the faith of such purpose, and thereafter supplied them with water through said canals, I think it is clear, both from the Civil Code (sec. 552), from our decisions on the subject, and from considerations of sound public policy and justice, that such consumers would have a right to insist on the continuance of the supply to their lands, that such right would be paramount to that of consumers in any newly formed district to which the water company might afterward undertake to supply water, and that such new users would be

entitled to receive water only from the surplus of the company's water after the users in the first mentioned district were supplied to the extent of their needs, not exceeding the amount per acre originally stipulated.

But as I understand the case, the petitioners did not attempt to show such conditions. Their theory appears to be that the water company did construct its canals to the region in which their lands are situated and by means thereof did supply water to their lands, and that inasmuch as this canal system was thus maintained and this water so supplied for a number of years without taking on new consumers, except for lands lying "under said canals," as the phrase goes, and without extending its canals to distinctly new territory, the water of the company must now be deemed to have been dedicated exclusively to the use of these first consumers and to lands lying "under said canals," so far as may be necessary for beneficial uses on said lands, and that consumers in other territories can have no right except to the surplus.

These facts do not establish the exclusive dedication so claimed. They do not show the intent to confine the service of water to the first users alone, and they are entirely consistent with the existence of the intent on the part of the company to continue the extending of their system and the service of a part of their original supply to other users in other territory.

The evidence shows that the rights of the original users of the water included among the petitioners, for the most part at least, were obtained under contracts with the Sutter Butte Canal Company to serve water to particular tracts of land belonging to particular consumers for the term of the corporate existence of said company and at specified rates per acre for each year, and that these agreements contained a clause whereby the canal company reserved the right to "contract for the delivery of a thousand cubic feet of water per second," and provided that when its water supply became less than one thousand cubic feet per second, each user should be entitled only to a proportional share thereof. They also declared that the water right thereby created should be appurtenant to the land described. By these contracts the company agreed to deliver water at the rate of a constant flow of one second-foot for every 160 acres of

land. The land owner was to pay a lump sum of $13.50 per acre and a yearly rate of two dollars per acre. By notice on or before January 1st of any year the land owner could have at three dollars per acre two second-feet more for each 160 acres, for that year only. Contracts in this form were made covering about forty thousand acres. Other contracts were made covering from twelve thousand to fifteen thousand acres, which were similar in form, except that the water was to be used only for rice crops, the quantity was not limited, the land owner agreed positively to take it for a short term of two, three, or four years, and thereafter could take it or not at his option. No price was stated, but the evidence is that seven dollars per acre was charged for water on these contracts. Water was also furnished to other lands along the canals for a year, on application to the company, at rates fixed by the Railroad Commission. The proper irrigation of rice, it appears, required about three times as much water as is necessary for ordinary crops, the quantity varying with the composition and texture of the soil. There was evidence before the commission showing that the area of land irrigated from this system had increased from time to time, until in 1919 the area irrigated for rice was twenty-two thousand acres and that for other crops was twenty-eight thousand acres. The water required for the rice land would be the equivalent of that required for sixty-six thousand acres in ordinary crops. The acreage irrigated for that year would require enough water, therefore, to irrigate twenty-eight thousand plus sixty-six thousand acres, or ninety-four thousand acres, at one second-foot per quarter-section the minimum rate fixed by the contract, or a constant flow of 587 second-feet.

The reservation by the aforesaid contracts, giving the company the right to make like contracts for supplying at least one thousand second-feet of water and to compel the land owners to prorate the water when less than that quantity was available, shows that the original proposal of the company was that the company would devote a water supply amounting to one thousand second-feet, constant flow, to all land owners who applied for water for irrigation of their land, under such contracts, until the water so contracted for amounted to that quantity, that the water used should not exceed the rate of three second-foot for each quarter-

section of 160 acres, and that the particular land covered by this limited number of contracts should constitute the area, district, or territory to which this particular one thousand second-feet of water should be dedicated. This was a dedication to a public use. (*Traber* v. *Railroad Com.*, 183 Cal. 304, [191 Pac. 366, 370].) The contracts did not prohibit the company from extending its canals into new territory and selling a part of the one thousand second-feet for use therein, or from furnishing at the rate of more than three second-feet to each quarter-section of land. The company could therefore dispose of the entire proposed supply of one thousand second-feet at such places and in such quantities as it pleased, without departing from the terms of the dedication, and such disposition would not constitute a new dedication of which any of such contract users could lawfully complain.

I am of the opinion that if the company had thus disposed of this entire supply, it would have amounted to a dedication of that quantity of water to public use for irrigation exclusively upon the lands described in the several contracts, and that neither the company nor the Railroad Commission could enlarge the dedication or expand the territory entitled thereto, so as to give to other lands an equal right to receive water out of that one thousand second-feet in common with the lands described in such contracts. The land so described would be entitled to preference in such use and other lands could rightfully receive water only from the surplus remaining after the rightful users had taken the quantity they had respectively contracted for so far as it was required for beneficial uses on their lands. (Civ. Code, sec. 552; *Merrill* v. *Southside Irr. Co.*, 112 Cal. 435, [44 Pac. 720]; *Palmer* v. *Railroad Com.*, 167 Cal. 174, [138 Pac. 997]; *Del Mar etc. Co.* v. *Eshleman*, 167 Cal. 681, [140 Pac. 591, 948]; *South Pasadena* v. *Pasadena etc. Co.*, 152 Cal. 588, [93 Pac. 490]; *Thayer* v. *California Dev. Co.*, 164 Cal. 135, [128 Pac. 21]; *Riverside Land Co.* v. *Jarvis*, 174 Cal. 321, 322, 324, [163 Pac. 54]; *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 161, 162, [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. Notes].)

But here it does not appear that the company had yet dedicated the whole of this one thousand second-feet at the time it proposed to supply the additional fourteen thousand

four hundred acres in 1920, to which the petitioners object. As above stated, the total area supplied up to and including the year 1919 required only a constant flow of 587 second-feet.  The fourteen thousand four hundred acres to be taken on in 1920, even if it were all irrigated for rice and required three second-feet for each quarter-section, would consume only 270 second-feet in addition, making in all 857 second-feet.  This comes well within the proposal to supply one thousand second-feet, and the petitioners do not appear to have any legal reason for their claim to preference in the use of the small supply available.  Their contracts require them to prorate with the other beneficiaries in that public use, in such a case.  It does not appear from the evidence, so far as I am advised from the briefs, that those of the petitioners who have received water only under the yearly applications require more water than could be supplied out of the margin of 133 second-feet remaining of the original one thousand second-feet to be devoted to these lands.  They therefore cannot claim any greater rights than the original contract users.

I wish to say further that the mere fact that the notice of appropriation under which the water company originally diverted the water from the Feather River named the counties of Sutter and Butte as the places of use has, in my opinion, no significance whatever with respect to the question of the dedication of the water to any particular use or place.  The facts in that respect are not essentially different from those considered in *Palmer* v. *Railroad Com.,* 167 Cal. 174, [138 Pac. 997]; wherein it was held that the dedication of the water taken under appropriation notices designating the place of use by similar indefinite statements would be manifested only by the actual taking of the water and supplying it to particular tracts or districts of land, and that the appropriation notices did not constitute such dedication.  I mention this because from the proceedings before the Railroad Commission it appears to have been assumed that these clauses in the appropriation notices constituted a dedication of the water to public use upon all the land embraced in the two counties named.

For these reasons I concur in the conclusion that the Railroad Commission acted within its powers in making the order here sought to be reviewed.