*9 Buch.*    Ventnor Inv. & Realty Co. *v.* Record Development Co.

In my judgment, the verdict is so clearly against the weight of the evidence that it cannot be properly used to control the final decree of this court. I am obliged to advise an order setting aside the verdict.

VENTNOR INVESTMENT AND REALTY COMPANY

*v.*

RECORD DEVELOPMENT COMPANY et al.

[Submitted June 19th, 1911. Determined July 14th, 1911.]

1. A second mortgage provided that parts of the premises might be released from the mortgage upon payment to the mortgagee of $50 for every lot so released, and all sums paid for such releases should be applied to the mortgage debt and to another prior mortgage, and further recited that, whereas the prior mortgagee had agreed to release any lots from its mortgage for $40 for each lot released, it was thereby agreed that upon payment of $40 for each lot released from the first mortgage the second mortgagee would release such lots for the sum of $10 a lot. That sum multiplied by the total number of lots covered by the mortgage would amount to less than the second mortgage debt, but the release of less than one-half of the lots at $40 a lot would discharge the first mortgage. The tract had been laid out into streets and lots, and the mortgage was executed to enable the mortgagor to sell the lots for building purposes.—*Held*, that the agreement for releases contemplated the execution of releases by the second mortgagee for $10 a lot whenever releases for the same lots were executed by the first mortgagee at $40 a lot, and that the second mortgagee would be entitled to $50 for each lot released after the first mortgage was discharged, though the second mortgagee was not required to execute releases unless similar releases were executed at the same time by the first mortgagee.

2. The covenant for releases was not personal to the mortgagor, but ran with the land for the benefit of a grantee of the mortgagor, even though it was not expressly so stated.

3. Where a second mortgage contained a covenant to release the mortgaged lots from the lien for the benefit of the mortgagor and his grantees to enable him to sell the mortgaged property for building lots, the right of his grantees to releases for lots sold in good faith before default continues after default and even after foreclosure proceedings are begun; a purchaser from the mortgagor prior to default being entitled to redeem.

4. First and second mortgagees could, as against third mortgage bondholders, extend the time of payment upon promises that payments would be made from time to time from the proceeds of the sale of third mortgage bonds, as there was no express or implied engagement on the part of the prior mortgagees that the third mortgagee should share in the lien of the prior mortgages in the event of the sale of third mortgage bonds in amounts less than sufficient to discharge the prior mortgages.

5. As a rule bonds and the mortgage securing them must be considered together, and holders of bonds referring to the mortgage are charged with notice of its contents, and where third mortgage bonds referred to the mortgage, which, in turn, referred to prior mortgages, and also stated that a part of the proceeds of such bonds should be used to pay for releases of the liens of the prior mortgages from lots covered by them, which were to be conveyed to the bondholders, and the prior mortgagees had no knowledge that the third mortgage bonds were designated "first mortgage bonds" or of any misrepresentations by the mortgagor to the third mortgage bondholders as to the status of the bonds, the latter were not entitled to any relief as against the first and second mortgagees because of any misrepresentations by the mortgagor.

On bill, &c.

*Messrs. Godfrey & Godfrey (Mr. H. Starr Giddings,* of counsel), for the complainant.

*Mr. John S. Westcott,* for the Record Development Company and receiver.

*Messrs. Gaskill & Gaskill,* for the Camden Safe Deposit and Trust Company.

*Messrs. Bourgeois & Coulomb,* for Wade and others.

*Mr. Ulysses G. Styron,* for Shaw and others.

*Mr. Terry Parker,* for Archibald Parker and others.

*Mr. James M. Sheen,* for Birmingham and others.

*Mr. Morris M. Gorson,* for Gorson and others.

LEAMING, V. C.

1 am convinced that the several cross-complainants, who, as purchasers of lots forming part of the mortgaged premises, seek to avail themselves of the benefit of the covenant touching releases contained in complainant's mortgage, are entitled to the relief sought by them.

In reaching this conclusion, I think it unnecessary to attempt to define any general rule to control cases of this class. As it is clearly within the power of a mortgagor and mortgagee to covenant that releases may be procured by the vendees of the mortgagor and that such releases may be procured by purchasers after default in the payment of the mortgage has occurred, it necessarily follows that the result of every controversy of this nature must be largely dependent upon the special circumstances of the case.

In the present case, the covenant contained in the mortgage is as follows:

"It is hereby expressly agreed that portions of the above-described premises shall and may be released from the operation of this mortgage upon the payment to said party of the second part the sum of fifty dollars for each and every lot so released; said lots being designated on a certain map or plan of said above-described premises entitled 'Map of building lots in Ventnor City, N. J., owned by Wheelock Company, by E. D. Rightmire, City Engineer, Ventnor City, N. J.,' which said map is duly filed in the clerk's office of said Atlantic county, or intended so to be.

"All sums paid for said releases shall be applied on account of the aforesaid debt of forty-one thousand three hundred dollars, and a certain mortgage owned by Camden, Atlantic and Ventnor Land Company to secure the payment of fifty-eight thousand seven hundred dollars and deducted therefrom.

"Whereas the Camden, Atlantic and Ventnor Land Company holds a mortgage of fifty-eight thousand seven hundred dollars, which is a prior lien to this mortgage, and whereas the holder of said mortgage has agreed to release any lot or lots from the lien of said mortgage at any time for the sum of forty dollars, for each lot so released, it is agreed that upon the payment of the sum of forty dollars for each lot released from the lien of said first mortgage that the holder of this mortgage will release such lots for the sum of ten dollars per lot."

This covenant can be adequately understood only when considered in connection with the circumstances surrounding the transaction at the time the mortgage was executed. Ten dollars

per lot, when multiplied by the total number of lots covered by the mortgage, would amount to a sum less than the amount of the mortgage debt.    There was, however, a prior mortgage, the holder of which was to receive $40 per lot for releases, and the release money from less than one-half of the lots at $40 per lot would have discharged the first mortgage.    It is, therefore, manifest that the covenant contemplates the execution of releases by complainant for $10 per lot, simultaneously with the execution of releases of the same lots by the first mortgagee at $40 per lot, and that when the first mortgage should be discharged complainant would become entitled to $50 per lot for each lot released.    The evidence also clearly discloses that complainant's mortgage was executed in the manner stated for the primary purpose of enabling the mortgagor to make sale of the lots comprising the mortgaged premises.    The entire tract was laid out into streets and lots and the mortgagor was to embark upon the enterprise of improving the tract and procuring purchasers for the several lots, and the covenant was manifestly designed to facilitate that work.    Lots were accordingly sold by the mortgagor in great numbers and releases were from time to time executed.    For such releases from the two mortgages $40 was paid to the first mortgagee and $10 to complainant.    The releases executed by complainant were sometimes made to mortgagor and were frequently made to mortgagor's grantees, and not infrequently to the grantees of the grantees of mortgagor, as will fully appear by the averment of the bill.    Under these circumstances, it is impossible to conclude that the covenant was regarded by the parties as a covenant personal to the mortgagor; on the contrary, it seems entirely manifest that the covenant was to facilitate sales and thus benefit the land, and was so intended and regarded by the parties to it.    The benefits of such a covenant should be regarded as running with the land and passing with the land to a grantee of the mortgagor, even though in the covenant it is not expressly stated that it is for the benefit of the assigns of the mortgagor. I am not prepared to say that when a release covenant can reasonably be said to have been made merely to enable a mortgagor to relieve a portion of the mortgaged premises from the lien of

the mortgage by payment of a substantial part of the mortgage debt, and not to facilitate sales, such a covenant may not be regarded as personal to the mortgagor and not for the benefit of grantees of part of the mortgaged premises; but where, as here, it is manifest that the covenant was intended to facilitate the operations of the mortgagor in selling lots to 'the general public, I think it clear that the benefits of the covenant should equitably inure to the purchasers of the lots.

It will also be observed that the covenant in question is not limited as to time. I think it clear that when a covenant of that nature and for that purpose is not restricted as to time, the right to releases for lots sold in good faith prior to default in reliance by the mortgagor upon the covenant will continue after default or even after foreclosure proceedings are begun. It may well be doubted whether such a covenant could be properly held to contemplate sales made after foreclosure proceedings had been instituted, or even after default, but I see no reason why redemption cannot be properly made by a purchaser whose purchase was made prior to default. I think the views here expressed may be said to be in harmony with the decisions which have been brought to my attention. See *Vawter* v. *Craft, 41 Minn. 14; Gammel* v. *Goode, 103 Iowa 301; Lane* v. *Allen, 162 Ill. 426; Bartlett Estate Co.* v. *Fairhaven Land Co., 94 Pac. Rep. 900; Baldwin* v. *Benedict, 111 Iowa 741; Pierce* v. *Kneeland, 16 Wis. 706; Squire* v. *Shepard, 38 N. J. Eq. (11 Stew.) 331; Hall* v. *Home Building Co., 56 N. J. Eq. (11 Dick.) 304; Avon-by-the-Sea Co.* v. *Finn, 56 N. J. Eq. (11 Dick.) 305; American Net and Twine Co.* v. *Githens, 57 N. J. Eq. (12 Dick.) 539; 27 Cyc. 1415, 1416.* All of the sales of lots here in question were made prior to the time when the mortgage became due.

As already stated, the covenant of release contemplates that $40 per lot shall be paid to the first mortgagee at the time releases are exacted from complainant. That part of the covenant is of importance to complainant, as it reduces the amount of the prior encumbrance. It necessarily follows that releases cannot be exacted of complainant unless similar releases can at the same time be procured from the first mortgagee by the payment of the amount named.

Cross-complainants, Archibald E. Parker and Edwina A. Parker, as bondholders under a third mortgage, claim relief by reason of alleged false representations and fraud. The claim of these cross-complainants cannot be sustained. The evidence fails to disclose any misrepresentation or fraud upon the part of either the Camden Safe Deposit and Trust Company, third mortgage trustee, or the first or second mortgagees. If any false representations were, in fact, made to these cross-complainants, they were made by agents of the Wheelock Land Company. The first and second mortgagees were in no way responsible for the third mortgage or for the manner in which the bonds which it secured were sold. It was purely within their privilege to extend the time for the payment of their respective mortgages upon the promise that payments would be made to them from time to time from moneys to be received by the sale of the third mortgage bonds. The evidence wholly fails to disclose any improper conduct or purpose on their part. The third mortgage trustee is also free from any imputation of misconduct. That company strictly performed the duties imposed upon it as trustee under the terms of the trust set forth in the mortgage, and the duties there prescribed are duties proper to be performed by a mortgage trustee. The grievance asserted by these cross-complainants arises by reason of their failure to ascertain the terms of the mortgage which secured the bonds by them purchased. The bonds which they purchased specifically referred to the mortgage which secured them, and a reference to that mortgage, as well as a reference to the public records, would have disclosed the existence of the two prior mortgages. In the mortgage which secured the bonds purchased by cross-complainants it was specifically set forth that seventy-five per cent. of the proceeds of each bond sold should be paid to the trustee—that is, $450 for each bond, and from that amount $50 should be used to pay for releases of the liens of the two prior mortgages from lots which were to be conveyed to purchasers of bonds, and the remainder paid to the two prior mortgagees equally from time to time as the fund reached $10,000 in amount. These proceeds from the sale of bonds were, in fact, so applied by the trustee in strict accordance with the requirements of the mortgage, and the mortgage accord-

ingly affords a complete justification to the trustee for the acts so performed. The bonds in question were designated "First Mortgage Gold Bonds," but a reference to the mortgage to which the bonds refer discloses that the plan was to devote seventy-five per cent. of the proceeds of sales of bond to the discharge of the prior mortgages "until said mortgages are paid in full and the same are canceled and discharged of record, and this mortgage becomes thereby the first lien on said premises." There is no evidence of a purpose upon the part of the mortgagor or the trustee company to deceive purchasers of bonds by the use of the designation referred to. If misrepresentations were, in fact, made by the agent of mortgagor to the Parkers, as is claimed, a remedy by rescission and restitution is now impossible, for the proceeds have been paid by the trustee to the prior mortgagees, and these mortgagees are in no way responsible for any alleged misrepresentations; it does not even appear that these prior mortgagees knew that the bonds were designated in the manner stated. I am unable to discern any theory on which relief can be extended to the cross-complainants named. The general rule is that bonds, and the mortgage securing them, must be considered together, and that all holders of bonds which refer to the mortgage which secures them must take notice of the contents of such mortgage. If the claim here were for relief against the mortgagor by reason of misrepresentations touching the bonds sold, I am not prepared to say that the claim would be without merit; although *Caylus* v. *New York, &c., Railway Co., 10 Hun 295;* affirmed in *76 N. Y. 609*, may be regarded as an authority to the contrary.

The cross-bill of the Camden Safe Deposit and Trust Company, as trustee under the third mortgage, seeks the procurement of releases of lots at the rate of $10 per lot from the lien of complainant's mortgage by reason of the payment of $5,000 made to complainant pursuant to the terms of the third mortgage already referred to. I think it clear that releases cannot be required by reason of that payment. Under the provisions of the release covenant complainant cannot be required to release a lot for $10 unless $40 are at the same time paid to the first mortgagee for a release of the lot. There was paid to the first mortgagee of this

cross-complainant but $5,000. This would, at most, make but $1,250 of the $5,000 paid to complainant applicable to releases. But it is entirely clear that the payment of $5,000 to complainant by this cross-complainant was in no sense made for the procurement of releases of specific lots from the lien of complainant's mortgage. On the contrary, this payment was made pursuant to the stipulation contained in the third mortgage. That stipulation created a fund known as the "Improvement Account," to which account $450 were to be paid from the proceeds of sale of each third mortgage bond; from that fund $50 of the $450 were to be devoted to the procurement of releases, and the remaining $400 were to be equally divided between the first and second mortgagees in reduction of their respective mortgages.

I will advise a decree in accordance with the views herein expressed.