695 A.2d 222

EDWARD SIMONSON AND SIMONSON FAMILY ASSOCIATES, L.P., PLAINTIFFS–APPELLANTS, v. Z CRANBURY ASSOCIATES, LIMITED PARTNERSHIP, A DELAWARE LIMITED PARTNERSHIP, DEFENDANT–RESPONDENT.

Argued October 22, 1996—Decided June 4, 1997.

*William D. Grand* argued the cause for appellants (*Greenbaum, Rowe, Smith, Ravin & Davis,* attorneys; *Mr. Grand* and *Gary K. Wolinetz,* on the briefs).

*Avrom J. Gold,* argued the cause for respondent (*Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg,* attorneys).

PER CURIAM.

The issue on this appeal is whether, in a foreclosure action brought by a mortgagee on a non-recourse purchase-money mortgage, the defaulting mortgagor is entitled to enforce a release provision covering a portion of the mortgaged property.

The subject property is a 249 acre farm in Cranbury, New Jersey. After the developer-mortgagor, Cranbury Associates, L.P. (Cranbury), had paid $180,000 in option payments to secure the right to purchase the property, owned by mortgagee Edward Simonson (Simonson),[1] Cranbury exercised its right to purchase the property. Cranbury paid ten percent of the $6,723,891 purchase price, as required by the option agreement, with a credit for the $180,000 in option payments previously made. Thus, Cranbury paid $490,000, bringing its total investment in the property up to $670,000. Cranbury's note for the remainder of the pur-

---

[1] Title to the subject property was transferred from Edward Simonson to Simonson Family Associates, L.P., during the course of this litigation.

chase price was secured by a non-recourse purchase-money mortgage in favor of Simonson.

The mortgage contained the typical developer's release provision:

3.A.   Releases from the lien of this Mortgage shall be obtained for the number of acres of property for which a release from the lien of this Mortgage is sought upon payment of a sum equal to the product of the following formula:

(Number of acres sought to be released) $\times$ (1.25) $\times$ ($27,000/acre)

The mortgage also contained an additional release provision:

Notwithstanding the foregoing, at any time upon Borrower's request, from and after the date hereof Borrower shall be entitled to the release from the lien of this Mortgage of 20.4 acres without payment of release consideration. . . .

The 20.4 acres subject to this additional release provision equates with the $670,000 in payments made by Cranbury towards the purchase of the entire property.

Cranbury defaulted on the note, and Simonson brought suit to recover the property in November 1990. Cranbury counterclaimed for the release of 20.4 acres of the property pursuant to the additional release provision. The Chancery Division granted Simonson's motion for summary judgment, but held that Cranbury was entitled to the value of 20.4 acres of the property.

The Appellate Division affirmed the judgment of the Chancery Division. 302 *N.J.Super.* 179, 695 *A.*2d 279 (1996). The court rejected Simonson's argument that the absence of default was a condition precedent to Cranbury's exercise of the release provision. The court also rejected Simonson's argument that an approved subdivision or development plan was a condition precedent to the exercise of the release provision.

We granted Simonson's petition for certification, 144 *N.J.* 379, 676 *A.*2d 1094 (1996), and affirm substantially for the reasons set forth in the Appellate Division opinion. We add only the following comments in light of the dissent.

As noted by the Appellate Division, and implicitly recognized by the dissent, the interpretation of the release provision at issue in this case is dependent primarily on the intent of the

parties. *Krosnowski v. Krosnowski*, 22 *N.J.* 376, 386, 126 *A.*2d 182 (1956). The general purpose of the agreement must guide a court's interpretation of its particular terms. *Id.* at 387, 126 *A.*2d 182.

■ The Appellate Division properly understood that the particular release provision at issue in this litigation was intended to assure the mortgagor some return on its investment of approximately $700,000 toward the purchase of the $6.7 million farm. 302 *N.J.Super.* at 185, 695 *A.*2d at 283. As noted above, there are actually two release provisions in the mortgage: the typical developer's release provision, and the additional release provision pertaining to the 20.4 acres. Typical release provisions usually are intended to permit the developer to obtain releases for specific parcels of mortgaged property, so that the developer-mortgagor may transfer clean title to the ultimate purchasers and so that the developer-mortgagor can generate revenues to fund the continuing development of the property. The provision pertaining to the 20.4 acres, however, does not contemplate a developed parcel to be sold as part of the development; on the contrary, it is intended to address a different and relatively unique situation.

The dissent erroneously fails to distinguish between the two release provisions contained in the agreement, and analyzes the relevant, contested release provision as if it were the more typical developer's release provision. *Post* at 545–555, 695 *A.*2d at 226–232. The dissent correctly perceives that continued development of the remainder of the tract subject to the mortgage is part of the consideration for the typical developer's release provision. *Post* at 553, 695 *A.*2d at 230. In respect of that type of provision, a defaulting mortgagor would not be permitted to obtain a release because the mortgagor's default goes to the very consideration for the provision itself.

However, it is clear that continued development of the property does not make up any part of the consideration for the provision at issue on this appeal. To condition the release provision on the absence of default would be tantamount to reading the provision

out of the agreement altogether, because absent default on the note, Cranbury would own the property outright and thus have no need for a release pertaining to only 20.4 acres. Instead, the provision essentially memorialized the fact that Cranbury already had purchased the 20.4 acres, and that the mortgage lien did not apply to that amount of the property from the date that Cranbury exercised the option. As properly found by the Appellate Division, 302 *N.J.Super.* at 185, 695 *A.*2d 283, there was substantial credible evidence before the trial court sufficient to enable it to come to that conclusion. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

■ The Appellate Division also properly concluded that the mortgagor was not required to obtain subdivision approval prior to its exercise of the release provision. Although the contract could be interpreted literally to impose such a requirement, *see post* at 558–560, 695 *A.*2d at 233–234, a contract should not be construed literally so as to defeat the probable intention of the parties; rather, "particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention." *West Caldwell v. Caldwell,* 26 *N.J.* 9, 25, 138 *A.*2d 402 (1958). Because the intent of the release provision was to protect the mortgagor's investment risk, it would frustrate the intent of the parties to require further that the mortgagor obtain subdivision approval before realizing the benefit of its bargained-for security. A more reasonable interpretation of the provision, consistent with the intent of the parties and the purpose of the agreement, would be to require an approved subdivision or development plan only when release is sought pursuant to the typical developer's release provision contained in the agreement.

Although summary judgment is usually inappropriate when factually-sensitive issues such as intent are present, the courts below properly found that, based on the overall purpose of the contract, there was no genuine issue as to the parties' intent in respect of the release provision. *Brill v. Guardian Life Ins. Co.,*

142 *N.J.* 520, 666 *A.*2d 146 (1995). Thus, summary judgment was appropriate in the present case.

The judgment of the Appellate Division therefore is affirmed.

STEIN, J. dissenting.

The critical issue posed by this appeal is whether a developer who defaults on payments due on a purchase money note secured by a nonrecourse mortgage on the residential tract to be developed is entitled to enforce, by way of counterclaim in a foreclosure action, a partial-release provision in the mortgage entitling the developer to the release of acreage having a value substantially equivalent to the down payment at closing. An oversimplified statement of the issue is whether the mortgagor's default in payments due on the underlying note relieves the mortgagee of its obligation to honor the release provision.

The lower courts concluded that the apparent intention of the parties was that the right to the release of 20.4 acres was perfected as of the closing of title, the release having been bargained for by the mortgagor as the rough equivalent of the down payment of $670,000 made at closing. The record, however, is uninformative and ambiguous concerning whether the parties intended that the right to release of the property would survive a default in the note secured by the mortgage. At oral argument, we were informed specifically by counsel for the mortgagor that the parties had never entered into negotiations concerning that question, although he argued that the plain language of the mortgage supported the mortgagor's right to a release notwithstanding the default in the note.

The Court is content to affirm the judgment of the Appellate Division which, in turn, affirmed the Chancery Division's determination that the mortgagor's right to the release of 20.4 acres was not defeated by the subsequent default. The Court apparently views the question presented as fact-sensitive, and has elected to affirm substantially on the basis of the opinion below. The Court additionally suggests that that result is required because the

"additional release provision" in question is unrelated to the continued development of the property. The Court concedes that continued development is the purpose of the general release provision and acknowledges that that provision could not be enforced in the event of an intervening default. *Ante* at 539, 695 *A*.2d at 223.

The Court's characterization of the "additional release provision" as one "intended to assure the mortgagor some return on its investment of approximately $700,000," *ante* at 539, 695 *A*.2d at 223, is naive. The sole purpose of the "additional release provision," as with the general release provision in the mortgage, was to improve the builder's cash flow in order to facilitate development of the subdivision. The 20.4 acre release, after subdivision approval, would allow the builder to sell lots in that parcel free and clear of the mortgage and generate funds for future mortgage payments and additional construction.

Read in context, what the Court characterizes as an "additional release provision" is actually a subpart of the general provision governing releases. The first sentence of Paragraph (3)(A)—what the Court calls "the typical developer's release provision"—sets out the ratio of acres to be released to payments made on the note. The second sentence of Paragraph (3)(A)—what the Court calls "an additional release provision"—provides that the borrower is entitled to the release of 20.4 acres without further consideration, and also that the borrower is entitled to releases for access roads, utilities and other easements "as may be credited against the release consideration. . . ." It is clear that the second sentence is intended to specify how the general principles set out in the first sentence will be applied to the one-time down payment, on the one hand, and to any special one-time releases, on the other. There is no implication that the underlying *purpose* of the 20.4 acre release provision is in any way unique.

Neither is the inclusion in the mortgage agreement of a provision for a partial release based on the down payment unusual. Partial release provisions frequently provide for down payments to

be credited towards the monetary consideration required for those releases. The fact that the requirement of monetary consideration is satisfied with a down-payment credit does not suggest that other, nonmonetary, conditions on releases are thereby nullified. *See infra* at 549–551, 695 *A*.2d at 228–229.

Unquestionably, the only purpose for the 20.4 acre release provision was to facilitate the mortgagor's development of the subdivision. Because the mortgagor's default prevents the performance of the very obligation in consideration for which the 20.4 acre release clause was granted, the release clause should not be enforced. The Court's unfortunate misperception of the purpose of the release clause results in a totally unjustified windfall for the mortgagor.

In my view, the interrelationship between the release provision and the subsequent default on the underlying note presents an issue of substantial importance. I would reverse the judgment below and hold that the right to a partial release explicitly was conditioned on approval of the proposed subdivision, and that, in the absence of express language in the mortgage providing that the right to a partial release of mortgaged property survives the mortgagor's default, the mortgagee is not obligated to honor the release provision after default.

I

Petitioners, Edward Simonson and Simonson Family Associates, L.P. (Simonson) own a farm consisting of approximately 249 acres in Cranbury, New Jersey. That farm is at the northeast corner of the intersection formed by Cranbury Neck Road and George Davidson Road. Defendant, Z Cranbury Associates Limited Partnership (Cranbury) is a developer whose principal, Lawrence Zirinsky, was an experienced and highly successful developer; Zirinsky is now deceased.

In the 1980's, the climate for residential development in Cranbury was favorable although Cranbury's zoning ordinances mandated a minimum lot size of six acres. Developers, realtors, and

residents of Cranbury made considerable efforts to persuade local officials to reduce the required lot size to two or three acres. It was anticipated that their efforts would be successful and that the zoning laws would be changed.

On June 17, 1982, Simonson entered into an option agreement with Cranbury, a real estate developer. Cranbury paid $10,000 in exchange for a one-year option to purchase the farm for $5,380,-500. The proposed payment schedule if the option were exercised called for a payment of 10% of the purchase price in cash or certified check at the time of the exercise of the option, with the balance payable pursuant to a purchase money mortgage. The option agreement gave Cranbury the right to extend the option to buy for two additional twelve-month periods, at $10,000 for each extension. Cranbury exercised both of those extensions, paying Simonson a total of $30,000 in option payments.

On June 17, 1985, Simonson and Cranbury executed an option extension agreement, which extended the option to buy for an additional one-year period. For that extension Cranbury was required to pay $50,000. Once again, the agreement gave Cranbury the right to extend the option to buy for two additional twelve-month periods. This time, however, the exercise of each extension would cost Cranbury $50,000. Once again, Cranbury exercised both available options, paying an additional $100,000. Thus, Cranbury paid Simonson a total of $180,000 between 1982 and 1988 solely to maintain its option to purchase the farm.

Although the minimum lot requirements were never changed, Cranbury exercised its option to buy the farm on June 24, 1988. Cranbury planned to subdivide and develop the property. The total cost was $6,723,891 and defendant paid $490,000 at the closing, amounting approximately to the difference between ten percent of the purchase price and the $180,000 in option payments that were credited against the price of the farm. Simonson took a note from Cranbury for the remainder of the purchase price ($6,051,502), to be repaid in ten annual installments of $605,150.19. The note was secured by a mortgage covering all of the property.

The Rider to the mortgage agreement contains a partial-release provision that reads in relevant part as follows:

3. A. Releases from the lien of this Mortgage shall be obtained for the number of acres of property for which a release from the lien of this Mortgage is sought upon payment of a sum equal to the product of the following formula:

(Number of acres sought to be released) $\times$ (1.25) $\times$ ($27,000/acre)

*Notwithstanding the foregoing, at any time upon Borrower's request, from and after the date hereof Borrower shall be entitled to the release from the lien of this Mortgage of 20.4 acres without payment of release consideration,* and in addition at any time on Borrower's request and without payment of additional release consideration, such acreage as Borrower shall require for construction of access roads and installation of utilities and such other easements as may be credited against the release consideration to be paid hereunder all amounts paid in reduction of the principal amount of the Note which this Mortgage secures.

B. No such release shall leave any of the Property remaining subject to the lien of this Mortgage landlocked or without access to a publicly dedicated road. As a condition to the grant of any such release, Lender shall have the right to require easements for ingress, egress and utilities necessary for the development of the property remaining under the lien of this Mortgage. Such easements shall include easements for ingress and egress and for both public and private utilities. Said releases shall be prepared by Borrower and submitted to Lender, prior to the execution of same by Lender, for Lender's review. Borrower shall bear the sole cost and expense of preparation and recordation of said releases and shall also pay to Lender's attorney its review fee up to $100 for review of said release document.

C. All acreage to be released shall be contiguous and shall contain a reasonable proportion of roadway frontage, open space and "green belt" areas. Lender may reserve in any release documents given to Borrower the right of ingress and egress in any access roads or any roadways then in construction or thereafter to be built by Borrower, its successors and assigns, as well as retaining for Lender and its successors and assigns, the right to connect at Lender's sole cost and expense to any utility then or thereafter passing through, over or upon the lands to be released by Lender to Borrower.

D. *No portion of the mortgaged premises shall be released from the lien of this Mortgage unless it is legally transferable as an entity separate from the remainder of the mortgaged premises in accordance with a legally effective subdivision or approved development plan.*

[Emphasis added.]

On May 10, 1989, approximately one month prior to the due date of Cranbury's first mortgage payment, Dan Murphy, a lawyer who is Edward Simonson's personal friend and real estate advisor, wrote to Lawrence Zirinsky. In that letter, Dan Murphy reminded Zirinsky of the upcoming due date. Murphy further stated:

... Under the terms of the note and mortgage you are entitled to a release of certain lands from the lien of the mortgage. If, at this time, you have determined the parcel to be released, please send me a sketch so the release documents can be prepared. If, on the other hand, you have not selected a specific parcel for release, we will be happy to acknowledge an appropriate release credit at any future date.

[*Ibid.*]

Cranbury had difficulty paying Simonson. In June 1989, Cranbury paid Simonson $100,000 for a one-year extension of the date on which the first payment on the note and mortgage was due. By the time that one-year extension expired, Zirinsky had passed away, the township's zoning had not changed, Cranbury had not commenced any development on the land, and the property values in the area had plummeted. Cranbury failed to pay any real estate taxes on the farm, and defaulted on its promissory note.

Simonson filed a complaint in foreclosure in November 1990, to which Cranbury asserted by counterclaim its right to obtain the unconditional release of 20.4 acres from the mortgage pursuant to Paragraph (3)(A) of the Rider to the mortgage. In November or December of 1991, according to counsel for Cranbury, Cranbury filed an application for minor subdivision of a certain 20.4 acres of the farm with the municipal planning board.

Prior to trial, both parties moved for summary judgment. The trial court granted summary judgment of foreclosure on the entire tract to Simonson. Although the court denied Cranbury's motion for summary judgment on its counterclaim, it concluded that Cranbury was entitled to receive the value of the 20.4 acres covered by the release provision.

The trial court rejected Simonson's argument that Cranbury had failed to satisfy a condition precedent to the release provision, namely the existence of a legally effective subdivision plan. The court found no evidence that the parties had intended the subdivision requirement in Paragraph 3D of the Rider to serve as a condition precedent to the provision for release of 20.4 acres without further payment. The court rejected Simonson's additional argument that its duty to honor the release provision had been excused by Cranbury's default on the mortgage. The court

nevertheless concluded that defendant had not been entitled to the "unusually" valuable 20.4 acres that it had selected for release. After an admeasurement hearing to fix an appropriate value for 20.4 acres, the court entered judgment on Cranbury's counterclaim for $463,521.77.

In an unpublished opinion, the Appellate Division affirmed. That court concluded that the record supported the trial court's determination that Cranbury had acquired an enforceable right to the 20.4 acres before it had defaulted on the note and that that right had survived the default. The Appellate Division also rejected Simonson's renewed contention that defendant's failure to obtain a legally effective subdivision plan had amounted to the failure of a condition precedent.

We granted Simonson's petition for certification. 144 *N.J.* 379, 676 *A.*2d 1094 (1996).

II

In general, a party who breaches a contractual covenant is not entitled to the other party's performance of a mutually dependent covenant. That basic principle of contract law has been incorporated in the *Restatement (Second) of Contracts* § 237 (1981):

[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

As stated by this Court: "When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." *Nolan v. Lee Ho*, 120 *N.J.* 465, 472, 577 *A.*2d 143 (1990); *see Ross Sys. v. Linden Dari–Delite, Inc.*, 35 *N.J.* 329, 341, 173 *A.*2d 258 (1961); *Frank Stamato & Co. v. Borough of Lodi*, 4 *N.J.* 14, 21, 71 *A.*2d 336 (1950). Therefore, when in a counterclaim to a foreclosure action a defaulting mortgagor seeks enforcement of its rights under a partial-release provision, the court must inquire whether the mortgagee's promise to grant releases is dependent or independent of the mortgagor's promises under the mortgage agreement. If the promises are

dependent, the mortgagee's obligation to grant partial releases does not survive the mortgagor's default.

Courts in most jurisdictions have treated that question as one of contract interpretation, turning on the language used in the agreement and the circumstances of the transaction as a whole. *See* J.R. Kempler, Annotation, *Construction of Provision in Real– Estate Mortgage, Land Contract, or Other Security Instrument for release of Separate Parcels of Land as Payments Are Made,* 41 *A.L.R.*3d 7, 67 (1972 & Supp.); 55 *Am.Jur.2d Mortgages* § 417 (1996). New Jersey cases are in accord. *See Ventnor Inv. & Realty Co. v. Record Dev. Co.* 79 *N.J. Eq.* 103, 105, 80 *A.* 952 (Ch.1911) ("I think it unnecessary to attempt to define any general rule to control cases of this class. As it is clearly within the power of a mortgagor and mortgagee to covenant that releases may be procured by the vendees of the mortgagor and that such releases may be procured by purchasers after default in the payment of the mortgage has occurred, it necessarily follows that the result of every controversy of this nature must be largely dependent upon the special circumstance of the case."). As in the interpretation of other types of contracts, where the language of the agreement is not conclusive, the court's inquiry necessarily focuses on the surrounding circumstances and the reasonable purposes and expectations of the parties. See *Tessmar v. Grosner,* 23 *N.J.* 193, 201, 128 *A.*2d 467 (1957). "Terms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written." *New Jersey Bank v. Palladino,* 77 *N.J.* 33, 46, 389 *A.*2d 454 (1978).

New Jersey courts have been reluctant to interpret partial-release provisions as independent of the mortgagor's obligations where such an interpretation would benefit the defaulting mortgagor to the detriment of the mortgagee's security. For example, in *Goldman South Brunswick v. Stern,* 265 *N.J.Super.* 489, 493, 627 *A.*2d 1160 (App.Div.1993), the Appellate Division agreed with the trial court's reasoning that "the mortgage was an executory contract and once defendants breached the contract by their

failure to pay principal and interest payments, it would be unfair to permit defendants to continue to receive benefits by way of release of units of land." Earlier courts have invoked the general principle that "where the mortgagor is in default, there can be no obligation on the mortgagee to release any part of the mortgaged tract." *Chatsworth Estates Co. of N.J. v. Chatsworth Estates Co. of N.Y.*, 121 *A.* 517, 517–18 (Ch.1923). Courts have also recognized that "[t]he equity the [mortgagor] had in the mortgaged premises, after condition broken, was an equity of redemption from the mortgage debt—not an equity to compel a release that might impair the mortgagee's security." *Avon by The Sea Land and Improvement Co. v. Finn*, 56 *N.J. Eq.* 805, 807, 41 *A.* 366 (E. & A. 1898); *see also Gillies v. Dyer*, 93 *N.J. Eq.* 348, 350, 116 *A.* 704 (Ch.1922), ("[O]n default, the right of complainants to foreclose the mortgage was absolute, and the release clause ... lost its operative effect."), *aff'd*, 93 *N.J. Eq.* 635, 117 *A.* 611 (E. & A.1922).

Although the interpretation of partial-release provisions has often been treated as fact-sensitive, courts in other jurisdictions frequently have reached similar conclusions. *See, e.g., Toole–Tietzen & Co. v. Colorado River Dev. Co.*, 38 *F.*2d 850, 852 (S.D.Cal.1930) ("[I]f we call into use equitable principles, it would seem inescapable that the special release conditions in favor of the mortgagor be deemed reciprocal with the obligation imposed upon him to fully perform those acts which he contracted to do in favor of the opposite party."); *Rolfes v. O'Connor*, 844 *P.*2d 1330, 1333 (Colo.Ct.App.1992) ("[Defendant] argues, therefore, that, because plaintiff has committed a serious breach of the obligations assumed by him under the promissory note and deed of trust and has not offered to make plaintiff whole with respect to the transaction, equity will not aid him. We agree."); *Gerber v. Karr*, 231 *Md.* 180, 189 *A.*2d 353, 355 (1963) ("[A]bsent an agreement in the mortgage to the contrary, a mortgagor cannot call for a partial release after defaulting on his obligations under the mortgage."); *Clarke v. Cowan*, 206 *Mass.* 252, 92 *N.E.* 474, 476 (1910) ("[The partial-release provision] was, we think, a privilege to be exercised before the mortgage debt became due according to the terms of

the mortgage."); *First Trust & Sav. Bank v. Bitter Root Valley Irrig. Co.,* 251 *F.* 320, 323 (D.Mont.1918) ("Certainly [the mortgagor] is in no position to compel the trust deed trustees to perform provisions of the said deed for its benefit; it refusing performance of its dependent covenants of said deed for the said trustees' benefit."); *Clason's Point Land Co. v. Schwartz,* 237 *A.D.* 741, 262 *N.Y.S.* 756, 759–60 (1933) ("The release clause is not to be viewed as independent of the mortgagor's covenants. The various provisions of the mortgage must here be construed together as dependent stipulations."). *But see, e.g., Burroughs v. Garner,* 43 *Md. App.* 302, 405 *A.2d* 301, 306–09 (Ct.Spec.1979); *Eichorn v. Lunn,* 63 *Wash.App.* 73, 816 *P.2d* 1226, 1229 (1991); *cf. Eldridge v. Burns,* 76 *Cal.App.*3d 396, 142 *Cal.Rptr.* 845, 856, 865, 872–73 (1978) (holding that money damages may be available to defaulting mortgagor for value of releases although specific enforcement of releases is not); *Cochran v. Teasley,* 239 *Ga.* 289, 236 *S.E.*2d 635, 637 (1977) (same).

It should be noted that courts do not necessarily distinguish between partial releases based on future payments and partial releases based on payments already made. *See Goldman, supra,* 265 *N.J.Super.* at 491–93, 627 *A.2d* 1160 (holding mortgagor not entitled after default to enforce provision for releases proportionate to down payment); *see also, e.g., Empress Homes v. Levin,* 201 *So.*2d 475, 477 (Fla.1967) (holding mortgagor not entitled after default to enforce provision calling for partial releases "without additional consideration"); *Moriello v. Matrix Production & Realty, Ltd.,* 53 *A.D.*2d 931, 385 *N.Y.S.*2d 391, 392 (App.Div.1976) (holding mortgagor not entitled after default to enforce provision requiring partial release without consideration beyond down payment); *Clason's Point, supra,* 262 *N.Y.S.* at 757–60 (holding mortgagor not entitled to exercise release provision where releases were partially paid but not demanded before default); *Fulton v. Jones,* 167 *A.D.* 765, 153 *N.Y.S.* 87, 89 (App.Div.1915) ("Assuming that there was a sufficient tender, and that it was kept good, I am of opinion that the privilege of obtaining a release was lost by the failure to duly demand it before default in payment of the princi-

pal."). *But see Conley v. Poway Land & Inv. Co.*, 232 *Cal.App.*2d 22, 42 *Cal.Rptr.* 636, 640 (1965).

Cases in which courts determined that the mortgagee's promise to grant partial releases was dependent on the mortgagor's obligations under the mortgage—and thus that the right to releases did not survive default—can be explained by the underlying purpose of partial-release provisions. As recognized by prior New Jersey case law, partial-release provisions in mortgage agreements are generally understood as "intended to permit the mortgagor-developer to release from the lien of the mortgage portions of the tract that were subdivided and readied for sale." *Romano v. Washington Tp. Assocs.*, 184 *N.J.Super.* 320, 323, 446 *A.*2d 174 (App.Div.1982). It is also well understood that parties contemplate that " 'the grant of releases [will] be followed by the sale of homes which [will] generate monies to be used to pay the Mortgage.' " *Goldman, supra,* 265 *N.J.Super.* at 494, 627 *A.*2d 1160; *see also Bitter Root Valley, supra,* 251 *F.* at 322–23 ("The trust deed contemplated a going concern selling lands, paying bond installments, and keeping all its contracts with the trust deed trustees and purchasers of lands."); *Harada v. Burns,* 50 *Haw.* 528, 445 *P.*2d 376, 379 (1968) ("[T]he very existence of the release clause in the mortgage agreement supports the inference that its purpose was to facilitate the sale and conveyance of clear title to parcels of the land subject to the mortgage in order to generate funds which could be used to reduce the remaining indebtedness."); 29 *New Jersey Practice* § 149, at 686 (Roger A. Cunningham & Saul Tischler) (1975) ("[T]he release provision usually aims only at the release of portions of the mortgaged land upon payment of specified sums of money—often in contemplation of the sale of the mortgaged land in parcels by a real estate subdivider-developer."). Thus, part of the consideration for the mortgagee's promise to grant partial releases is the mortgagor's promise to continue development of the land and make future payments on the mortgage note. When the mortgagor no longer has any hope or intention of fulfilling these obligations, the purpose underlying the release provision is extinguished. In such

situations, courts may conclude that the parties intended that the promises be dependent and that the obligation to grant releases ends on the mortgagor's default.

Many cases in which courts have come to the opposite conclusion can be explained as exceptions to the general rule. For example, New Jersey courts have granted counterclaims in foreclosure actions based on partial release provisions where the mortgagor had tendered payment previous to default and the mortgagee had wrongfully refused to grant the release. *See Bleyer v. Veeder,* 119 *N.J. Eq.* 398, 407, 183 *A.* 203 (Ch.1936); *Bruen v. Spannhake,* 118 *N.J. Eq.* 134, 141, 178 *A.* 73 (Ch.1935); *see also Park Inv. & Dev. Co. v. Vanderzee Bros. Bldg. Co.,* 119 *N.J. Eq.* 1, 2–3, 180 *A.* 838 (Ch.1935) (holding mortgagor entitled to partial releases where mortgagor had paid over three-quarters of mortgage principal and where parties disputed whether mortgagor had sought releases prior to default). A functional rationale for these rulings is that the mortgagee's refusal to grant the release may have precipitated the default.

Most New Jersey cases holding that the promise to grant partial releases was not dependent on the mortgagor's obligations have involved partial-release provisions exercised by purchasers of single subdivided lots from the original mortgagor-developer rather than release provisions exercised by the original mortgagor-developer. Courts have generally interpreted that type of provision to survive default on the part of the mortgagor, at least where the sale to the purchaser occurred before default. *See Ventnor, supra,* 79 *N.J. Eq.* at 107, 80 *A.* 952. Those courts recognized that, in regard to the loan as a whole, a mortgage agreement providing a third-party purchaser with the right to exercise a partial-release provision does "not attempt to create the relation of debtor and creditor between the grantees of the mortgagor and the mortgagee." *Hall v. Home Bldg. Co.,* 56 *N.J. Eq.* 304, 306, 38 *A.* 447 (Ch. 1897). Instead, courts have interpreted that type of agreement as "practically [having] the effect of distributing the mortgage through the tract, very much as if a separate mortgage

was given on every [lot sold by the mortgagor]." *Harris v. Pearsall,* 83 *N.J. Eq.* 472, 473, 91 *A.* 880 (Ch.1914); *see also Van Arsdale v. Gorenflo,* 93 *N.J. Eq.* 486, 489, 116 *A.* 869 (E. & A.1922) (holding that even where sale was made after mortgagor defaulted on interest payments but before bond was due, purchaser from mortgagor had right to exercise release provision); *Hagaman v. Frederick,* 109 *N.J. Eq.* 288, 290, 157 *A.* 86 (Ch.1931) (holding that builder who took title to two houses in satisfaction of payment due from successor mortgagor-developer was entitled to enforce release clause in mortgage after default); *Malba Terrace Corp. v. Portaupeck Properties, Inc.,* 105 *N.J. Eq.* 453, 456, 148 *A.* 206 (Ch.1930) (holding that purchaser from mortgagor who made demand for release after maturity of mortgage but before commencement of suit for foreclosure was entitled to release).

Similarly, in other jurisdictions, many of the cases holding that a partial-release provision survived default have been cases in which the benefit of the provision was claimed by a third-party purchaser. *See, e.g. Norris v. Schwartz,* 114 *Fla.* 248, 153 *So.* 910, 910 (1934); *Vawter v. Crafts,* 41 *Minn.* 14, 42 *N.W.* 483, 485 (1889); *Rosenberg v. General Realty Serv.,* 231 *A.D.* 259, 247 *N.Y.S.* 461, 464 (1931); *White v. Tegnell,* 206 *S.W.* 213, 215 (Tex.Civ.App. 1918). Some courts explicitly have held that purchasers from the original mortgagor may have the right to enforce a partial-release provision after default, or even after foreclosure proceedings have begun, although the original mortgagor does not. *See Bitter Root Valley Irr., supra,* 251 *F.* at 323; *Chrisman v. Hay,* 43 *F.* 552, 554–55 (C.C.S.D.Iowa 1890). Somewhat analogous are cases involving joint mortgagors where the mortgage agreement provided that specified individually-owned lots would be released in consideration of set payments. *See American Net & Twine Co. v. Githens,* 57 *N.J. Eq.* 539, 541, 41 *A.* 405 (Ch. 1898) (distinguishing case where lots to be released were individually owned from case where lots were part of a single tract owned by mortgagor); *Horne v. Payne,* 586 *S.W.*2d 101, 103 (Tenn.1979) (holding that joint mortgagor who was not personally liable for note was entitled, after maker of note defaulted, to enforce provision for

release of separate parcel to which she had title, where release provision specified payment necessary for release of her individual parcel).

The critical distinction between partial-release provisions intended to be exercised by individual owners of separate parcels and those intended to be exercised by mortgagor-developers of large tracts lies in the underlying purpose of the releases. Where the parties intend that the release provision be exercised by the individual owner of the lot to be released, the release payment functions as full consideration for a complete and final discharge of that person's obligation; in that case, the purpose of the partial-release provision is effectuated by enforcing it, even after default. Where the parties intend that the release provision be exercised by a developer, then consideration for the release is not only the release payment, but also the continued development of the property and repayment of the mortgage note by the mortgagor. In such cases, the partial-release provision no longer serves its purpose after default.

New Jersey courts have recognized that the continuing development of the land by the mortgagor is an important element of the mortgagee's security in the typical mortgage agreement that includes a partial-release provision to be exercised by a mortgagor-developer, and have relied on that recognition in explaining why particular partial-release provisions should be considered to be personal to the original mortgagor. In *Dimeo v. Ellenstein*, 106 *N.J. Eq.* 298, 150 *A.* 675 (Ch.1930), the original mortgagors had conveyed the plot to a corporation that subsequently conveyed it to another corporation. *Id.* at 299, 150 *A.* 675. The new owner sought and tendered payment for partial releases under a provision in the original mortgage agreement. The mortgagee refused and, after the mortgage fell due, filed for foreclosure. The court held:

The covenant is circumscribed and the reason for restricting it to the mortgagors is well illustrated by the present effort of the [new owner] to withdraw the more valuable of the security, leaving the dregs out of which to make the balance of the purchase money. It emphasizes why the mortgagees chose to deal only with the

> mortgagors, for they would be stimulated to further improve the land to realize the mortgage money and so discharge themselves of their bond obligation; an urge that would be absent in their assigns. This, plus confidence in their mortgagors' integrity, it is fair to presume, was part inducement to release to the mortgagors and negatives an intention to deal with the mortgagors' assigns, who, as in this case, would have no responsibility.
>
> [*Ibid.*]

Because the mortgagee's security was based in part on the ongoing relationship between mortgagor and mortgagee, the court determined that the parties would not have intended that the right to exercise the partial-release provision would extend to subsequent purchasers. *See also Squier v. Shepard,* 38 *N.J. Eq.* 331, 333–34 (Ch. 1884) (holding that benefit of release provision did not inure to purchasers from mortgagor because mortgagee did not originally intend to bind himself according to actions taken by parties other than original mortgagor).

In *Romano, supra,* the Appellate Division relied in part on *Dimeo* to hold that the successor to the original mortgagor was not entitled after default to enforce a release provision in the mortgage, even where the stated consideration for release was the previously made down payment. 184 *N.J.Super.* at 323, 446 *A.*2d 174. Shortly after the purchase money mortgage had been entered into, the corporate mortgagor conveyed the land to its principals in partnership and formally dissolved, leaving the mortgagee essentially with a nonrecourse mortgage. *Id.* at 321, 446 *A.*2d 174. The successor mortgagor partnership defaulted on the mortgage, the mortgagee foreclosed, and the partnership counterclaimed for partial releases. *Id.* at 322, 446 *A.*2d 174. Although the mortgage agreement expressly provided that the mortgagor was entitled to release of 20.37 acres, at its election, without further payments, the Appellate Division held that under the circumstances the partnership was not entitled to the release. The court stated:

> The record here shows, as the trial judge found, that the covenant was intended to permit the mortgagor-developer to release from the lien of the mortgage portions of the tract that were subdivided and readied for sale. That development never eventuated; yet at the same time the principals of [the original mortgagor corporation] had effectively deprived plaintiffs of any recourse on the bond by

transferring the entire tract to themselves as partners and dissolving the mortgagor corporation. Thus, upon the aborting of the development plans and after default on the mortgage and the commencement of the foreclosure action, plaintiffs found themselves faced with an "election" by those same principals, now in partnership, to release what is conceded to be the best part of the tract, leaving plaintiffs with both their security impaired and without recourse under the bond for any deficiency. We find that the covenant cannot fairly be read to authorize its exercise by [successor mortgagor partnership] under these circumstances.

[*Id.* at 323, 446 *A.*2d 174.]

As in *Dimeo,* the court's analysis of the parties' intent under the mortgage agreement relied heavily on the importance of the continued development of the land by the mortgagor to the mortgagee's security.

The courts in *Romano* and *Dimeo* were apparently influenced by the fact that the mortgagor's conveyance effectively converted the mortgage into a nonrecourse instrument. In *Goldman, supra,* the Appellate Division extended the reasoning in *Romano* and *Dimeo* to hold that, where the mortgage is originally nonrecourse, a partial-release provision based on the down payment is not enforceable after default, even by the original mortgagor. 265 *N.J.Super.* at 494–96, 627 *A.*2d 1160. That mortgage agreement provided that, on demand by the mortgagor, the mortgagee would release a portion of the property in consideration of the down payment made at closing. *Id.* at 491, 627 *A.*2d 1160. At the time the mortgagors defaulted they had demanded release of only a part of the acreage equivalent to the down payment under the stated formula. The mortgagee filed for foreclosure and the mortgagor counterclaimed, seeking specific performance of the release provision. *Id.* at 492–93, 627 *A.*2d 1160. The trial court granted summary judgment to the mortgagee. *Id.* at 493, 627 *A.*2d 1160. The Appellate Division affirmed, finding that the opposite outcome would "make no economic sense and produce an unjust result." *Id.* at 494, 627 *A.*2d 1160.

The *Goldman* panel endorsed *Romano* 's analysis of the purpose of this type of partial-release provision:

In *Romano,* the court looked to the context and purpose of the release clause and found that in the context of the proposed construction of a residential development, it was contemplated that the consideration for the release clause would be

continued development and payment of the mortgage loan. The court found that where the mortgagor ceased construction of units and made it impossible for the mortgagee to obtain mortgage payments as it contemplated, it would be unfair to compel the mortgagee to comply with the release clause to a grantee.

[*Id.* at 495, 627 *A.*2d 1160.]

The Appellate Division also emphasized that enforcement of the release provision would leave the mortgagee without remedy because the mortgage was nonrecourse in nature. *Id.* at 494–96, 627 *A.*2d 1160. The Appellate Division concluded its opinion with an appeal to the equities of the case, quoting the trial judge:

To start with I have one side who has not breached and another side who has. I mean that may be an oversimplification but that is the true fact here and he who has not breached is going to be damaged and he who has breached is going to walk away with a certain amount of property free and clear. That just doesn't make any sense to me.

[*Id.* at 496, 627 *A.*2d 1160.]

### III

The Appellate Division distinguished the case on appeal from *Goldman, supra,* based on the presumed intent of the parties. In my view, that distinction finds no support in this record. The language of the Simonson/Cranbury mortgage does not speak to the operation of the release provisions in case of Cranbury's default. Moreover, Simonson testified that he had never discussed the partial-release provisions with Cranbury, and Zirinsky passed away before suit was initiated. Zirinsky's associate testified that Zirinsky had sought the release provision concerning the 20.4 acres so that he would retain some benefit if he "walked away" from the deal in the future. However, even that second-hand statement does not necessarily address the situation that ultimately arose, where Cranbury "walked away" before even obtaining a legal subdivision or making a single payment on the mortgage. At oral argument, counsel for Cranbury conceded that the parties had never negotiated the question whether the release provision would survive a default of the mortgage. Therefore, I can not agree that substantial credible evidence exists to support the finding that the Cranbury/Simonson agreement encompassed

the understanding that at closing Cranbury acquired a right to partial releases that would survive despite Cranbury's default. See *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

Because the parties failed to express any agreement regarding the effect of default on the operation of the release provisions, the court was required to supply this term as a matter of contract construction; the principle question is what rule best effectuates the business purposes and reasonable expectations of the parties. See *Palladino, supra,* 77 *N.J.* at 46, 389 *A.*2d 454. I believe that the best rule is one that is consistent with *Goldman*—that, in the absence of a contract provision to the contrary, a nonrecourse mortgagor who is in default ordinarily has no right to partial releases, whether or not those releases are based on payments already made. *See Goldman, supra,* 265 *N.J.Super.* at 493–94, 627 *A.*2d 1160. The rationale for that rule of construction was also expressed by *Goldman:* The. purpose of typical partial-release provisions contained in mortgages given to residential developers is to facilitate the sale of individual lots in order that the developer may continue to pay the note and finance further development; when the development comes to a halt, the partial-release clause no longer serves its intended purpose, and the mortgagor should no longer be entitled to exercise it.

This case demonstrates the good sense of that rule. The Simonson/Cranbury nonrecourse purchase money mortgage agreement was clearly based on the premise that the mortgagor would be engaged in an ongoing process of developing the mortgaged land and thereby paying off the mortgage. The parties conceded at oral argument that they shared that understanding and intent. Further evidence that the purpose of the release clause was to facilitate implementation of the development plan can be found in the provisions in the mortgage agreement limiting the right to releases. First, the agreement specifically provided that no portion of the mortgaged land would be released from the lien unless it could be conveyed as a separate lot under an

approved subdivision. The agreement also required that any releases would not leave the remainder of the property "land-locked," that any releases be contiguous, and that any releases contain "a reasonable proportion of roadway frontage, open space and 'green belt' areas." In addition, the mortgagor covenanted that it would "not alienate substantial or material 'development rights or credits' from all or any part of the Property to the effect that the Property would lose substantial or material ability to have improvements developed thereon, ..." Those provisions were apparently intended to ensure that any releases would not dispro-portionately impair the mortgagee's remaining security. Those provisions also demonstrate that a crucial component of the mort-gagee's security was the ongoing development of the land.

Simonson has consistently argued that under the agreement an approved subdivision was a precondition to any release and that one reason Cranbury's counterclaim must fail is that that precon-dition was never satisfied. The Chancery Division found that the requirement of a subdivision did not extend to the provision for the release of 20.4 acres with no further payment. The Appellate Division agreed. That conclusion is flawed. Paragraph (3)(A) of the Rider to the mortgage agreement contains the release provi-sions. The first sentence provides for releases according to a formula based on payments. The second sentence provides for, "at any time upon Borrower's request," release of 20.4 acres "without payment of release consideration" and for release of land for access roads and other construction needs. Paragraphs (3)(B), (C) and (D) provide restrictions on the releases. In particular, paragraph (3)(D) provides:

> No portion of the mortgaged premises shall be released from the lien of this Mortgage unless it is legally transferable as an entity separate from the remainder of the mortgaged premises in accordance with a legally effective subdivision or approved development plan.

Neither the literal language nor the sentence or paragraph struc-ture of the mortgage suggests that the restriction in Paragraph (3)(D) applies to some releases and not to others. The letter from Dan Murphy suggesting that the release would be forthcoming if

Cranbury submitted a sketch is not dispositive because Murphy's authority is questionable and the letter itself is internally inconsistent.

The broad logic of the agreement compels the same conclusion as the language. Most importantly, the immediate release of the 20.4 acres from the lien of the mortgage would not have benefited Cranbury because Cranbury would not have been permitted to develop or separately convey that parcel without an approved subdivision. *See N.J.S.A.* 40:55D–55 (prohibiting conveyances of property not lawfully subdivided). Also, from the perspective of the Simonson's security, the precondition of a valid subdivision plan guaranteed that three important goals would be achieved before that security would be diminished by the granting of any release. First, by obtaining subdivision approval, Cranbury would have taken the first crucial step towards implementing the development, thus enhancing its ability to repay the purchase money mortgage. Second, as noted by counsel at oral argument, the value of the remaining property would have been increased substantially by virtue of the approval of the subdivision. Third, because the township undoubtedly would have needed approximately one year to review and approve a major subdivision—it is unlikely that a planning board would approve a minor subdivision for a portion of the tract if a major subdivision were pending—Simonson would have been assured of at least one annual payment on the mortgage. Without the precondition, on the other hand, Simonson would have left itself vulnerable to precisely the outcome that Cranbury attempted to achieve: Cranbury defaulted without making a single payment on the mortgage and then claimed the right to an exceptionally valuable 20.4 acre parcel that had yet to be subdivided. If Cranbury's initial claim had been enforced, title to the land would not have been clear until the minor subdivision was obtained, and Simonson would have, in the end, been deprived of the most valuable portion of its property with nothing more than the option payments to show for several years in which the property had been tied up post-closing. Moreover, the property declined markedly in value during that period.

The Chancery Division recognized the unfairness of such an outcome when it held that Cranbury was not entitled to delay the foreclosure or to choose the most valuable 20.4 acres, and ruled that Cranbury's claim was limited to the average value of 20.4 acres of the property. That result, however, was only marginally preferable to Cranbury's proposal. Under that court's disposition, not only has Simonson lost the benefit of its bargain with Cranbury on the sale of the land and the opportunity to recoup its losses by otherwise disposing of the property while it was subject to foreclosure and then admeasurement proceedings, but Simonson is now actually assessed with a sizable judgment against it. Ironically, Simonson does not have the ability to satisfy that judgment by selling off a portion of the land without first obtaining a subdivision.

In summary, under the Cranbury/Simonson agreement, the right to the release did not vest at the closing: the achievement of an approved subdivision plan was a precondition to that right. When Cranbury defaulted, it had not obtained a subdivision and therefore the right to the release had not in any sense accrued. Moreover, by defaulting on the mortgage, Cranbury breached its obligations not only to pay the mortgage when due but also to subdivide and develop the Simonson property, the very obligations in exchange for which the promise to grant partial releases had been given. In the absence of any contract provision to the contrary, that default should be presumed to be a "breach of a material term of an agreement," such that "the non-breaching party is relieved of its obligations under the agreement." *Nolan, supra*, 120 *N.J.* at 472, 577 *A.*2d 143.

## IV

I would reverse the judgement of the Appellate Division.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, and COLEMAN—4.

*For reversal*—Justices STEIN, O'HERN and GARIBALDI—3.